# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### July 23, 2009 Session

## MADDEN PHILLIPS CONSTRUCTION, INC. v. GGAT DEVELOPMENT CORPORATION

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-05-1777-1     Walter L. Evans, Chancellor**

_____

**No. W2008-02350-COA-R3-CV - Filed September 25, 2009**

_____

This appeal arises out of a dispute between a contractor and landowner over the parties' duties under a construction contract. Plaintiff/Appellee Madden Phillips Construction, Inc. ("Madden Phillips") filed suit to enforce a mechanics' and materialmen's lien and to recover damages in breach of contract against Defendant/Appellant GGAT Development Corporation ("GGAT").[1] Madden Phillips' complaint included a claim for damages and attorney's fees pursuant to Tennessee Code Annotated sections 66-34-101 to -703, also known as the Prompt Pay Act of 1991 ("Prompt Pay Act"). GGAT counterclaimed and asserted, *inter alia*, that Madden Phillips failed to perform its contractual obligations in a "workmanlike and expeditious fashion to coincide with the completion schedule of [GGAT]."

The trial court ruled in favor of Madden Phillips. The trial court determined that GGAT wrongfully terminated Madden Phillips from the construction project and refused to compensate Madden Phillips in bad faith. The court further concluded that GGAT's actions constituted a material breach and prevented GGAT from recovering on its counterclaim. The trial court entered judgment in favor of Madden Phillips for damages and attorney's fees in the amount of $88,739.51, plus interest and court costs. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

---

[1]The trial court entered a consent order discharging Madden Phillips' mechanics' and materialmen's lien and depositing the amount due under the contract with the chancery court clerk's office on October 15, 2007. The trial court entered the order in lieu of the statutory release of lien bond provided at Tennessee Code Annotated section 66-11-142(a). *See* Tenn. Code Ann. § 66-11-142(a) (Supp. 2008). The record indicates that the parties no longer intended to proceed on enforcement of plaintiff's lien at trial. The funds substituting for Madden Phillips' lien appear to remain with the court clerk pending review on appeal.

Scott Andrew Frick, Memphis, Tennessee, for the Appellant, GGAT Development Corporation.

John Willet, Memphis, Tennessee, for the Appellee, Madden Phillips Construction, Inc.

**OPINION**

**I. Background and Procedural History**

This dispute arose over a period of approximately twelve months beginning in April 2004. Negotiations between GGAT and Madden Phillips for construction on the Germantown Manor Subdivision ("Germantown Manor") began when William Tagg ("Mr. Tagg"), senior vice-president of GGAT, provided Glen Sherman ("Mr. Sherman"), estimator for Madden Phillips, a copy of the plans for development. Mr. Sherman used the plans to prepare Madden Phillips' proposal, including its estimates for importation of fill material. Mr. Sherman determined that GGAT would need to import 23,103 cubic yards of off-site fill material to complete the job.

Mr. Sherman incorporated his calculations into a proposal letter dated April 26, 2004. Madden Phillips proposed to perform five scopes of work labeled "earthwork," "storm," "sewer," "lump sum water," and "streets." The proposal included a detailed list of services that Madden Phillips would perform under each scope of work and a total price for each. The earthwork scope of work included several specific duties. Madden Phillips proposed to cut and fill 21,808 cubic yards of existing dirt, provide 3,103 cubic yards of fill material and compact the site to specifications, fine grade ten acres, construct a silt fence, and install inlet protection.

Madden Phillips and GGAT subsequently agreed to incorporate the proposal into a contract to provide materials and perform services at Germantown Manor. The parties negotiated the contract at the home of Mr. Tagg, where Mr. Sherman presented Mr. Tagg with a contract that Madden Phillips had prepared. The contract, which incorporated by reference the prior proposal, was a standard form contract that Madden Phillips modified to fit the parties' needs. The parties disagree on what exactly Mr. Tagg and Mr. Sherman discussed during this meeting. Mr. Sherman testified at trial that he reviewed the contract with Mr. Tagg and Mr. Tagg questioned only the amount of earthwork necessary under the contract. Mr. Sherman stated that Mr. Tagg did not request to add any specific contractual provisions to the contract, nor did the parties enter into any oral agreements that varied the terms of the written contract. Mr. Tagg testified to the contrary that the parties pointedly discussed a time for completion. Mr. Sherman and Mr. Tagg signed the form contract without notation or alteration.

Madden Phillips began work on the project in May 2004. Disputes over the scope of performance soon developed. According to Madden Phillips, GGAT failed to provide and compact the stipulated amount of fill material necessary to complete the project, placed fill material in improper areas, provided unsuitable fill material, and refused to pay Madden Phillips for the construction of a silt fence around the perimeter of the work site. Madden Phillips believed that GGAT's attempt to directly pay Madden Phillips' subcontractor for construction of the silt fence was an attempt to modify the parties' contract and to remove the silt fence requirement from the

-2-

earthwork scope of work. Madden Phillips mailed Mr. Tagg a letter on June 28, 2004, that attempted to clarify the parties' duties under the contract. Madden Phillips purportedly wanted to ensure that GGAT would perform according to the terms of the contract.

The June 28th letter both clarified and modified provisions in the contract. The first paragraph spelled out Madden Phillips' perceived duties under the initial earthwork scope of work. It explained that Madden Phillips was responsible for cutting and filing 21,808 cubic yards of on-site dirt, providing 3,103 cubic yards of imported fill material, fine grading ten acres, constructing 2,827 linear feet of silt fencing, and installing inlet protection. The second paragraph stated that GGAT must place and compact the 20,000 cubic yards of fill material for which it was responsible entirely within a fill area.[2] The letter stated that, in the alternative, Madden Phillips could spread and compact the fill material at a unit price of $1.50 per cubic yard. The letter further stated that the ten acres of fine-grading was actually 10.23 acres and was non-negotiable. Finally, the letter offered to remove Madden Phillips' duty to supply 3,103 cubic yards of fill material, provided that Madden Phillips would continue to charge $1.50 per cubic yard to spread and compact dirt that GGAT provided.

Madden Phillips suspended its performance on July 9, 2004, after GGAT did not sign or respond to the June 28th letter. Testimony at trial showed that Mr. Tagg was out of town when Madden Phillips transmitted the letter. Mr. Tagg stated that he learned of Madden Phillips' decision to pull off the project only after he returned. Jackie Haynie, a foreman on the project, allegedly told Mr. Tagg upon his return that Madden Phillips pulled off the job to work on other projects. Mr. Madden testified, on the other hand, that Madden Phillips' other projects did not affect its performance at Germantown Manor. Mr. Tagg attempted to contact Madden Phillips on July 12, 2004, to discuss its demobilization. Madden Phillips refused to return to the site unless Mr. Tagg signed the June 28th letter.

The parties eventually resolved their disputes and Madden Phillips resumed construction at the site after an absence of approximately forty-five days. The parties orally agreed in August 2004 to remove Madden Phillips' duty to perform the earthwork scope of work from the original contract. The modified contract required Madden Phillips to spread and compact soil that GGAT provided on an hourly basis.[3] The oral modification also removed silt fencing and erosion control from the scope

---

[2]The contract does not clearly place the duty to spread and compact the presumed existing 20,000 cubic yards of dirt on either party. The contract indicates that Madden Phillips would charge $1.50 per cubic yard to cut and fill 21,808 cubic yards of fill material from existing land. A separate provision shows that Madden Phillips would charge $6 per cubic yard of dirt imported above the 3,103 cubic yards it agreed to provide in the contract. The contract does not indicate who is responsible for spreading and compacting the 20,000 cubic yards of dirt that GGAT was supposed to provide, except that a general provision requires Madden Phillips to "furnish all labor, equipment, material, supervision, and services" to complete the contract. GGAT nonetheless argued in its brief that the June 28th letter "did not in any way change any of the existing terms of the [c]ontract."

[3]GGAT argues that the parties agreed Madden Phillips would complete the project on a time and material basis. GGAT contends that the modification left the earthwork scope intact, but changed the method of compensation. As we

(continued...)

of Madden Phillips' obligation. It placed on GGAT the burden of providing the entire 23,103 cubic yards of off-site fill material. The other scopes of work remained unchanged.

The parties proceeded under the modified contract for approximately eight months. GGAT provided fill material for the project from several sources. Madden Phillips' other construction sites eventually became the primary source of fill material on the project. Madden Phillips and GGAT entered into separate agreements to provide dirt from three separate work sites at the prices of thirty, forty, forty-five, and fifty dollars a load.[4] Nevertheless, delays ensued. Madden Phillips' work logs showed that it experienced several mechanical failures. Mr. Tagg raised equipment-related concerns with Madden Phillips at least once during this period, but Mr. Tagg refused Madden Phillips' request to provide more and better equipment at the site for an additional cost. Madden Phillips' work logs also showed that a lack of fill material prevented it from proceeding at various points during the project. These delays and Madden Phillips' prior suspension of performance caused construction on the project to extend until late April 2005.

Madden Phillips completed approximately ninety percent of its work at Germantown Manor before termination. GGAT terminated Madden Phillips on April 21, 2005, after Madden Phillips requested a change order in the amount of $5,000 for extra work needed to prepare the road for paving. Madden Phillips stated that the extra work was necessary due to the poor quality of dirt that Mr. Tagg supplied. Mr. Tagg contended that Madden Phillips was responsible for the quality of the dirt and that Madden Phillips' defective work necessitated the repair. Mr. Tagg testified that this request, along with Madden Phillips' untimely performance and questionable billing practices, led

---

[3](...continued)
will explain in detail, *infra*, the evidence does not preponderate against the trial court's finding that the parties agreed to remove the earthwork scope of work and proceed on an hourly basis.

[4]The parties eventually agreed to lower the cost of fill material brought in from a site in Collierville to forty-one dollars a load.

to his decision to remove Madden Phillips from the project.[5] GGAT later faxed Madden Phillips a letter of termination that gave no grounds for termination.

Madden Phillips soon thereafter initiated process to recover sums for labor, services, and materials provided at Germantown Manor. Madden Phillips notified GGAT by certified mail, return receipt requested, of its intent to claim relief under the Prompt Pay Act on May 6, 2005. Madden Phillips later filed notice of its mechanics' and materialmen's lien with the Shelby County Register of Deeds on June 21, 2005. In September 2005, Madden Phillips filed suit in Shelby County Chancery Court. GGAT answered and filed a counterclaim on November 14, 2005. Madden Phillips responded to GGAT's counterclaim on December 19, 2005.

The parties proceeded to trial in June 2008.[6] The trial court heard the matter over a period of four days. The trial court did not announce an oral ruling at the conclusion of the trial, but instead offered each party an opportunity to submit proposed findings of fact and to further expound on proposed conclusions of law. The trial court issued its findings on August 7, 2008, which closely resembled the proposed findings of fact and conclusions of law that Madden Phillips prepared.

On September 11, 2008, the chancellor entered judgment in favor of Madden Phillips. The court awarded Madden Phillips $59,671.51 on its breach of contract claim and $29,068 in attorney's fees under the Prompt Pay Act. The final judgment totaled $88,739.51, plus interest and court costs. The court also resolved GGAT's counterclaim in favor of Madden Phillips. GGAT did not file a motion to alter or amend under Rule 52.02 of the Tennessee Rules of Civil Procedure, but filed a notice of appeal on October 10, 2008.

---

[5]The trial court excluded GGAT's offer of proof on the issue of charges allegedly billed in excess of the contractual agreement because GGAT failed to supplement its interrogatory responses after it agreed to provide the alleged amounts. GGAT argues in a single statement in its brief that the trial court erred when it sustained Madden Phillips' objection. This Court recently stated:

> In order for an issue to be considered on appeal, a party must, in his brief, develop the theories or [offer] authority to support the averred position. Where a party makes no legal argument and cites no authority in support of a position, such issue is deemed to be waived and will not be considered on appeal. Courts have consistently held that issues must be included in the Statement of Issues Presented for Review and an issue not included is not properly before the Court of Appeals.

*Petty v. White House*, No. M2008-02453-COA-R3-CV, 2009 WL 2767140, at *3 (Tenn. Ct. App. Aug. 31, 2009) (citations omitted) (internal quotation marks omitted). GGAT has not properly raised the question of whether the trial court erred when it excluded evidence of charges allegedly billed in excess of the contractual agreement. We will not consider it here.

[6]During the first day of trial, the court dismissed the intervening complaint of Custom Curbing, a subcontractor on the project, for failure to exhaust its remedies against Madden Phillips before pursuing an unjust enrichment claim against GGAT. Custom Curbing did not appeal the dismissal of its complaint.

## II. Issues Presented

GGAT raises a number of issues and sub-issues on appeal.  The primary issues, slightly reworded, are:

(1)     Whether the trial court violated its duty to act as a fair, impartial, and unbiased trier of fact when it issued findings of fact and conclusions of law that closely resembled Madden Phillips' proposed findings.

(2)     Whether Madden Phillips first materially breached the parties' contract.

(3)     Whether the trial court erred when it ruled in favor of Madden Phillips on GGAT's counterclaim.

(4)     Whether the trial court erroneously awarded attorney's fees to Madden Phillips under the Prompt Pay Act.

GGAT raises two additional issues that we will review within our analysis of whether Madden Phillips materially breached:

(1)     Whether the trial court erroneously concluded that the contract between GGAT and Madden Phillips to complete Germantown Manor did not contain a time limit.

(2)     Whether the trial court erred in finding that the parties' oral modification of the contract removed the earthwork scope of performance from the duties Madden Phillips owed.

## III.  Standard of Review

We review the decision of a trial court in a bench trial *de novo* upon the record, according a presumption of correctness to the factual findings of the court below.  Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).  We will defer to the factual findings of the trial court unless the preponderance of the evidence is to the contrary.  *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000).  Factual determinations based on a trial judge's assessment of witness credibility receive a higher degree of deference.  We will not reverse a finding of the trial court based on credibility unless clear and convincing evidence shows the finding to be in error.  *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Our review is *de novo* with no presumption of correctness if the trial court does not produce findings of fact.  *Archer v. Archer*, 907 S.W.2d 412, 416 (Tenn. Ct. App. 1995).  We review mixed questions of law and fact *de novo* with no presumption of correctness.  *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009).  We likewise review pure questions of law *de novo* with no presumption of correctness.  *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

## IV. Analysis

### *A. Findings of fact*

The first issue on appeal pertains to whether this Court should accord a presumption of correctness to the trial court's determinations of fact. The record shows that, prior to the conclusion of trial, the chancellor notified counsel that he intended to give each party an opportunity to submit proposed findings of fact and conclusions of law. The purpose of the chancellor's request was to allow the parties to expound upon their factual assertions, legal positions, and requested reliefs. Upon receipt of the parties' proposals, the chancellor relied heavily upon the findings and conclusions that Madden Phillips prepared. The trial court's findings of fact and conclusions of law adopted nearly verbatim the findings and conclusions offered by Madden Phillips, with some exclusions.

GGAT now asserts that the chancellor failed to fulfill his duty as a neutral finder of fact. GGAT argues that the court below "gave absolutely no independent thought or consideration to the evidence that had been presented during the trial of this case." GGAT also challenges the trial court's decision to request factual findings and legal conclusions without offering an indication of how the court planned to rule. The trial court's method appears neither "unprecedented," nor "unusual" despite GGAT's contentions.

The Tennessee Supreme Court addressed this issue in its early decision of *Nashville, Chattanooga, & St. Louis Railway Co. v. Price*, 148 S.W. 219 (Tenn. 1911). The trial judge in *Price* refused to reduce his decision to writing and required counsel for the winning party to prepare the findings of fact. *Price*, 148 S.W. at 220. The supreme court concluded that the trial court's procedure was impermissible. *Id.* The court stated that "[t]he preparation of such a finding, being a matter of so much importance and a high judicial function, cannot properly be intrusted to counsel." *Id.* The court reasoned that attorneys "have a natural bias with respect to cases in which they are engaged that makes it well-nigh impossible for them to fairly and fully present all the facts as the judge would do." *Id.* The *Price* court explained that factual findings are "accorded the highest dignity" by appellate courts and should therefore represent an independent conclusion of an unbiased judge. *Id.* The trial court's procedure in *Price* violated this standard because the trial court vested counsel with unchecked authority to determine the factual findings incorporated into the record. *Id.* The supreme court refused to give deference to the trial court's findings and recognized it would have reversed the trial court's decision had the parties disputed the facts. *Id.*

The Tennessee Supreme Court departed from the lofty standard of *Price* in *Delevan-Delta Corp. v. Roberts*, 611 S.W.2d 51 (Tenn. 1981), adopting a more permissive view of the judicial function under the modern rules of civil procedure. The trial court in *Roberts* took the case under advisement at the conclusion of trial and thereafter forwarded an outline of the court's findings to plaintiff's attorney. *Roberts*, 611 S.W.2d at 52. The trial judge asked plaintiff's attorney to prepare an order based on the trial court's outline. *Id.* Defendant's counsel moved pursuant to Rule 52.02 of the Tennessee Rules of Civil Procedure for written findings of fact and conclusions of law. *Id.*

Counsel for the plaintiff prepared proposed findings and conclusions, as well as an order incorporating the proposals. *Id.* The trial judge reviewed the findings before sending a letter to both counsel that indicated the court agreed with the plaintiff. *Id.* Defendant's counsel submitted a letter questioning the findings, but the trial court proceeded to sign the final order in favor of the plaintiff. *Id.*

The supreme court found no error in the actions of the trial court on this issue. The *Roberts* court found that Tennessee's adoption of the Tennessee Rules of Civil Procedure, specifically Rule 52.02, altered the trial court's duty to prepare findings of fact and conclusions of law. *Id.* The court affirmed that the trial court's responsibility to prepare findings and conclusions is a "high judicial function," but recognized that "the thorough preparation of suggested findings and conclusions by able counsel can be of great assistance to the trial court." *Id.* at 52-53. The court held that "although it is improper for the trial court to require counsel to prepare findings, it is permissible and indeed sometimes desirable for the trial court to permit counsel for any party to submit proposed findings and conclusions." *Id.* at 53.[7]

The *Roberts* court offered guidance to lower courts when establishing findings of fact. The court maintained a clear preference for factual findings that are a product of the judge's own labor. *Id.* The *Roberts* court recognized, however, that other procedures sufficiently maintain the independence and impartiality of courts that adopt party-prepared findings. The court stated that trial judges may rely on party-prepared findings, so long as they carefully review proposed findings to ensure that the findings reliably reflect the court's opinion based on the testimony and evidence produced at trial. *Id.* The court also recognized a need to ensure that the proposed findings dispose of all relevant issues. *Id.* The court advised trial courts to "ascertain that [party-prepared findings] adequately dispose of all material issues, and to assure that matters not a proper part of the determination have not been included." *Id.*

The *Roberts* court concluded that the trial court did not act improperly. *Id.* The supreme court noted that the trial court had already decided the case when it invited proposed findings and that counsel voluntarily offered proposed findings. *Id.* The court also pointed out that the defendant did not move to alter or amend the judgment under Tennessee Rules of Civil Procedure 52.02. *Id.* The court found no reason to upset the factual conclusions of the trial court. *Id.*

This Court applied the holding of *Roberts* in *Airline Construction, Inc. v. Barr*, 807 S.W.2d 247 (Tenn. Ct. App. 1990). The chancellor in *Barr*, similar to the chancellor here, asked the parties to submit proposed findings. *Barr*, 807 S.W.2d at 253. The chancellor eventually selected the findings that the defendants presented to the court, stating that the defendants' findings "'best represent[ed] the opinion of the [c]ourt.'" *Id.* The chancellor's opinion reproduced verbatim the proposed findings of the defendant. *Id.* The plaintiff/appellant in *Barr* asserted that no presumption

---

[7]We note that although the brief for Appellant states that the trial court "directed" counsel to prepare findings of fact and conclusions of law, it does not argue that the lower court impermissibly *required* counsel to submit such findings.

of correctness should accompany the trial court's findings of fact because there was no indication that the findings articulated the court's independent opinion. *Id.*

This Court rejected the appellant's challenge under the reasoning of the supreme court's opinion in *Roberts*. Importantly, we found that the appellant failed to demonstrate that the findings the trial court adopted did not represent the chancellor's view of the case. *Id.* at 254. We further noted that if the appellant did not approve of the findings, the appellant should have filed a motion to alter or amend pursuant to Tennessee Rules of Civil Procedure 52.02. *Id.* As in *Roberts*, the appellant did not file such motion. *Id.* We concluded that the chancellor's decision to adopt party-prepared findings was not reversible error or sufficient reason to abandon the ordinary presumption of correctness given to a trial court's factual findings. *Id.*

GGAT has equally failed to show that the trial court's findings of fact and conclusions of law did not represent the chancellor's views of this case. It is clear from the record that, although the chancellor reproduced verbatim a majority of Madden Phillips' proposed findings, he also excluded some findings. The trial court excluded findings of fact related to Madden Phillips' preparations to soil cement on the day of termination. Additionally, the trial court omitted findings that pertained to disputed charges for completion costs. The chancellor's modifications to Madden Phillips' proposed findings, at a minimum, surpassed the word-for-word reproduction we approved in *Barr*.

We conclude that the trial court did not err in relying on party-prepared findings of fact and do not find sufficient reason to abandon the ordinary presumption of correctness given to those factual findings. There is no indication that the trial judge did not carefully review the party-prepared findings to ensure the findings reliably reflected his opinion based on his observation of the witnesses and evidence produced at trial. There is likewise no indication that the trial court did not review the party-prepared findings to ensure they disposed of all relevant issues before the court. We once again note that a party who disagrees with a trial court's findings of fact may file a motion to alter or amend pursuant to Tennessee Rules of Civil Procedure 52.02. GGAT filed no such motion. We conclude that the chancellor's findings are entitled to the ordinary presumption of correctness and will proceed accordingly.

### B. Material breach

GGAT argues on appeal that the trial court erroneously held that Madden Phillips did not materially breach the parties' contract. GGAT asserts that Madden Phillips cannot recover for wrongful termination because Madden Phillips committed the first uncured material breach. We agree that a party who commits the first uncured material breach of contract may not recover damages for the other party's material breach. *United Brake Sys., Inc. v. Am. Envtl. Prot., Inc.*, 963 S.W.2d 749, 756 (Tenn. Ct. App. 1997) (citing *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990)). A party owed performance may, however, waive its right to assert the first uncured material breach as a bar to recovery on its own subsequent breach. *See 94th Aero Squadron of Memphis, Inc. v. Memphis-Shelby County Airport*, 169 S.W.3d 627, 635-36 (Tenn. Ct.

App. 2004); *Tenn. Adjustment Serv., Inc. v. Miller*, 390 S.W.2d 696, 701 (Tenn. Ct. App. 1964). These principles instruct our analysis on the issue of material breach.

GGAT argues that Madden Phillips first materially breached the parties' contract in five separate and distinct ways. GGAT first contends that Madden Phillips materially breached the contract when it suspended performance on the project for nearly six weeks. GGAT next offers Madden Phillips' alleged failure to properly man and equip the project. The third alleged material breach is Madden Phillips' failure to complete the project within eight months. Fourth, GGAT argues that Madden Phillips materially breached when it attempted to obtain additional payment to repair work that it defectively performed under the contract. Finally, GGAT submits that Madden Phillips materially breached when it performed defective work. We address these arguments in turn.

### i. Demobilization.

GGAT argues that Madden Phillips wrongfully demobilized from the project on July 9, 2004. Madden Phillips defends its actions, arguing that GGAT first materially breached the parties' contract when it paid Madden Phillips' subcontractor directly for silt fencing, placed fill material in non-fill areas, and disputed the amount of acreage under the earthwork scope of work. Madden Phillips argues that these and other actions amounted to anticipatory repudiation of the contract. Madden Phillips also asserts that GGAT failed to respond to what Madden Phillips described as a request for assurances, giving Madden Phillips a right to suspend performance.[8] We do not need to address the question of whether Madden Phillips breached the parties' contract when it suspended performance. GGAT accepted the benefits of the contract well beyond Madden Phillips' alleged initial breach, waiving its right to assert the breach.

Ordinarily, a party who first materially breaches may not recover under the contract. *United Brake Sys.*, 963 S.W.2d at 756. A non-breaching party may nevertheless waive its right to assert first material breach as a bar to recovery if it accepts the benefits of the contract with knowledge of a breach. *Aero Squadron*, 169 S.W.3d at 635-36 (citing 17 Am. Jur. 2d *Contracts* § 447 (1964)); *see also SMR Techs., Inc. v. Aircraft Parts Int'l Combs, Inc.*, 141 F. Supp. 2d 923, 934 (W.D. Tenn. 2001), *vacated for lack of subject matter jurisdiction*, No. 00-2563, 2004 WL 595010 (W.D. Tenn.

---

[8]We note that there is no established right to request for assurances in a contract for services in Tennessee. Our courts recognized no right to request for adequate assurances at common law. *See Ault v. Dustin*, 45 S.W. 981, 985 (1898) (quoting 2 William A. Keener, *A Selection of Cases on the Law of Contracts* 924 (1898)). The legislature has since codified an exception to this rule under Tennessee's Uniform Commercial Code where "reasonable grounds for insecurity arise with respect to the performance of either party" in a sales contract. Tenn. Code Ann. § 47-2-609(1) (2001). This Court has, in dictum, impliedly approved of requests for assurances outside of the sales context under the procedure set out in section 251 of the Restatement (Second) of Contracts. *See Harlan v. Hardaway*, 796 S.W.2d 953, 958 (Tenn. Ct. App. 1990). The United States Court of Appeals for the District of Columbia Circuit, given occasion to address the state of Tennessee law in this area, concluded that the concept "seem[ed] entirely sensible and one that Tennessee would likely turn from dictum to holding if the occasion presented itself." *See Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 242 (D.C. Cir. 1995) (citation omitted). Without expressing opinion, we note the absence of a definite right under the current state of the law.

Mar. 23, 2004). But there are circumstances where acceptance of contractual benefits does not constitute waiver. For example:

> *[M]ere efforts on the part of an innocent party to persuade the promisor, who repudiates his agreement, to reject that repudiation and proceed honorably in the performance of his agreement have been held not to involve a waiver of the innocent party's right to avail himself of the breach after the efforts finally prove unsuccessful.* Moreover, it has been held that the fact that a party did not act upon a breach but negotiated with the other party for a new contract does not constitute an acquiescence in the breach where such action was induced by misrepresentation by such other party. A defendant is precluded from claiming a waiver of breach of contract where he fraudulently induces the plaintiff to permit him to continue and thereafter violates the promises he made to induce the plaintiff to give such permission.

*W.F. Holt Co. v. A & E Elec. Co.*, 665 S.W.2d 722, 733-34 (Tenn. Ct. App. 1983) (alteration in original) (quoting 17 Am. Jur. 2d Contracts § 447 (1964)).

Waiver is an affirmative defense.[9] Tenn. R. Civ. P. 8.03. A party who raises the issue of waiver has the burden of proving it by a preponderance of the evidence. *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998) (citations omitted). This burden requires proof of some "'absolute action or inaction inconsistent with the claim or right' waived." *Id.* (quoting *Koontz v. Fleming*, 65 S.W.2d 821, 825 (Tenn. Ct. App. 1933)). It is Madden Phillips' position that GGAT's acceptance of performance for nearly eight months constituted waiver of any breach that occurred due to Madden Phillips' earlier suspension of performance.

Several of this Court's prior opinions guide our analysis on this issue. This Court addressed the waiver of breach in its decision of *Tennessee Adjustment Service, Inc. v. Miller*, 390 S.W.2d 696 (Tenn. Ct. App. 1964). *Miller* involved a dispute between a purchaser of a business ("Purchaser") and a former employee ("Employee") over the enforcement of an employment contract. *Miller*, 390

---

[9]Madden Phillips did not raise waiver as an affirmative defense in its answer to GGAT's counterclaim. Affirmative defenses not properly raised before the trial court generally do not merit consideration on appeal. *Harlan v. Hardaway*, 796 S.W.2d 953, 957 (Tenn. Ct. App. 1990); *see also 94th Aero Squadron of Memphis, Inc. v. Memphis-Shelby County Airport*, 169 S.W.3d 627, 633 (Tenn. Ct. App. 2004) (citing *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991); *Fidelity-Phenix Fire Ins. Co. v. Jackson*, 181 S.W.2d 625, 629 (Tenn. 1944)). An exception lies for issues not raised in the pleadings, but tried by implied or express consent of the parties. Tenn. R. Civ. P. 15.02; *Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 890 (Tenn. 1980). The parties testified to numerous facts related to GGAT's acceptance of performance beyond the alleged time for completion. Additionally, Madden Phillips expressly included the affirmative defense of waiver in its proposed findings of fact and conclusions of law. We believe that GGAT reasonably should have known that the issue of waiver was before the trial court. *See McLeod*, 597 S.W.2d at 890; *see also C & W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 679 (Tenn. Ct. App. 2007). GGAT did not object to the trial court's reliance on the affirmative defense of waiver, nor did it object to Madden Phillips' failure to comply with Rule 8.03. *See Oggs*, 230 S.W.3d at 679 (noting that failure to object waived the issue on appeal). GGAT likewise chose not to raise the issue on appeal. We will therefore consider the affirmative defense of waiver as if Madden Phillips properly raised it below.

S.W.2d at 314-15. Employee entered into a contract that contained a non-compete clause with the business' prior owner ("Owner"). *Id.* at 318. Owner allegedly entered into an oral contract that guaranteed Employee a right to purchase a controlling interest of stock in the company upon sale. *Id.* at 320-21. Owner also allegedly promised to release Employee from his employment contract in exchange for a subsequently completed stock transfer. *Id.* Owner eventually sold the business to Purchaser without offering to sell a controlling interest to Employee and without releasing Employee from his contract. *Id.*

Purchaser later sued to enjoin Employee from further violating the non-compete clause in Employee's contract. *Id.* at 320. Employee asserted Owner's breaches of contract as a defense to his decision to leave the company and attain employment with a direct competitor. *Id.* at 320-21. The trial court found in favor of Employee, concluding that the company had breached its contract with Employee and could not maintain suit. *Id.* at 321-22. This Court affirmed the decision of the lower court on other grounds, but held that Employee had waived his right to defend on the theory of first breach. *Id.* at 324, 327.

On the issue of waiver, this Court found it unnecessary to determine whether Owner had the power to bind the company under the two oral agreements made with Employee. *Id.* at 324. We found that Employee waived his right to rely on the prior breach because he remained in the employment of Purchaser for several months and received the benefits of the contract at issue. *Id.* We recognized that waiver of breach was consistent with the rule that a party may waive strict performance of a contract by another. *See id.* at 325 (citing *Morristown Lincoln-Mercury, Inc. v. Roy N. Lotspeich Publ'g Co.*, 298 S.W.2d 788, 793 (Tenn. Ct. App. 1956)).

In a second decision, *W.F. Holt Co. v. A & E Electric Co.*, 665 S.W.2d 722 (Tenn. Ct. App. 1983), we gave additional guidance on waiver of breach. *Holt* involved a dispute between a contractor and subcontractor over the subcontractor's deficient performance. *Holt*, 665 S.W.2d at 726. The subcontractor submitted five false invoices in violation of its contractual duties. *Id.* at 726-27. The parties twice met to discuss the fraud, which constituted material breach. *Id.* at 727, 730. The parties determined that the subcontractor could continue performance if it corrected and resubmitted the invoices and posted a performance bond. *Id.* at 727. The subcontractor unsuccessfully attempted to obtain the bond. *Id.* The contractor terminated the subcontractor after six weeks. *Id.* The subcontractor argued on appeal that contractor had waived breach when it accepted continued performance for six weeks. *Id.* at 733. The subcontractor asserted that the contractor accepted performance with full knowledge of the breach. *Id.*

This Court found that the contractor had not waived breach, despite its acceptance of the benefits of the contract. *Id.* at 734. We recognized that acceptance of contractual benefits normally prevents a party from asserting a prior breach. *Id.* at 733. We further articulated, however, that an innocent party's decision to accept continued performance based on fraudulent inducement or misrepresentation would not give rise to waiver. *Id.* at 733-34. This Court concluded that the contractor in *Holt* did not waive breach because the subcontractor induced the contractor not to terminate when subcontractor made assurances that it would obtain the required bond. *Id.* at 734.

The contractor rightfully terminated based on material breach when the subcontractor failed to make good on its representations. *Id.*

A more recent case, *94th Aero Squadron of Memphis, Inc. v. Memphis-Shelby County Airport*, 169 S.W.3d 627 (Tenn. Ct. App. 2004), addressed waiver of breach in a case where the non-breaching party ("Lessor") attempted to persuade the breaching party ("Lessee") to honor its contract. *Aero Squadron* involved a dispute between Lessor and Lessee over the termination of a long-term lease. *Aero Squadron*, 169 S.W.3d at 630. After protracted litigation and judgment for Lessor, Lessee raised nineteen issues on appeal. *Id.* at 633. One of the myriad issues raised was waiver of breach. Lessee argued that Lessor's acceptance of rent payments over a period of months following notice of default amounted to waiver of its right to terminate. *Id.* at 635. This Court disagreed. *Id.* at 636.

This Court again recognized that a party can waive another party's prior breach. We affirmed that "[i]n general, by accepting benefits under a contract with knowledge of a breach, the non-breaching party waives the breach." *Id.* at 635-36 (citing 17 Am. Jur. 2d *Contracts* § 447 (1964)). We added that unsuccessful attempts to convince the breaching party to honor its agreement do not amount to waiver. *Id.* at 636. A party must "by 'express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was [the party's] intention and purpose to waive.'" *Id.* (alteration in original) (quoting *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998)).

The *Aero Squadron* court found that Lessor did not waive its right to terminate the lease at issue or to claim breach:

> In this case, Lessor never indicated that it was releasing or waiving its rights under the lease by cooperating with Lessee's attempts to cure the defaults. In fact, there is nothing in the record to indicate Lessee ever asserted a waiver on the part of Lessor. On repeated occasions, Lessee represented that it was close to finding a subtenant and was arranging to have the premises repaired. In reliance on Lessee's repeated assurances, Lessor cooperated with Lessee in working towards an amicable resolution. While attempting to cure the numerous defaults, Lessee remained obligated under the lease to pay rent. By accepting those rental payments, Lessor was not waiving any breach on the part of Lessee because Lessee understood that it remained obligated under the lease to operate a restaurant or find a suitable replacement and restore the premises to a good state of repair and condition.

*Id.* This Court concluded that Lessor's decision to terminate the lease as soon as Lessee proved it was incapable of fulfilling the lease agreement showed Lessor had not waived its rights under the contract. *Id.*

The distinction between cases such as *Miller, Holt*, and *Aero Squadron* lies in the difference between a non-breaching party's decision to accept benefits as if cure of the breach has occurred and a decision to accept benefits while attempting to remedy the breach. In the former situation, the non-breaching party impliedly or expressly relinquishes objection and continues with the contractual agreement. The latter involves a temporary decision to withhold termination while the non-breaching party attempts to obtain proper performance or receives representations inducing abeyance. Accepting benefits in the latter situation does not amount to acts manifesting an intent and purpose not to claim the breach. GGAT's actions in the present case fall within the former category.

GGAT waived its right to defend on the basis of Madden Phillips' prior material breach. Assuming *arguendo* that Madden Phillips wrongfully suspended its performance on July 9, 2004, it returned to the project approximately one-and-a-half months later in August 2004. GGAT thereafter accepted the benefits of Madden Phillips' performance upon return for nearly eight full months before terminating the contract. GGAT accepted these benefits after having full opportunity to cancel the contract. Although not written in terms of breach, a letter dated July 14, 2004, expressly offered GGAT an opportunity to terminate the contract. GGAT did not act on this offer, nor did it otherwise give any indication that it believed Madden Phillips remained in breach after Madden Phillips resumed performance. By allowing Madden Phillips to complete ninety percent of the project without further objection, GGAT waived its right to assert Madden Phillips' wrongful suspension as the first material breach of the parties' contract.[10]

Our conclusion rests on the determination that Madden Phillips did not induce GGAT to modify the parties' contract based on misrepresentation. As we noted earlier, a party who forgoes action on a breach does not waive his rights to sue for breach when he negotiates a new or modified contract in reliance on misrepresentations of the breaching party. *See W. F. Holt Co. v. A.&E. Elec. Co.*, 665 S.W.2d 722,734 (Tenn. Ct. App. 1983). The parties here modified the contract in order to clarify their contractual obligations. Madden Phillips did not induce forbearance based on misrepresentation, but rather the parties affirmatively agreed to continue their relationship on new terms. GGAT's decision to modify the contract and continue performance under these circumstances waived its right to assert Madden Phillips' suspension of performance as the first uncured material breach.

### ii. Re-mobilization.

GGAT next argues that Madden Phillips failed to adequately man and properly equip the Germantown Manor project in violation of its contractual duty to perform in an "expeditious" and

---

[10]Our finding of waiver makes it unnecessary to determine the related issue of whether GGAT should be equitably estopped from asserting first uncured breach as a defense. GGAT's continued acceptance of performance on the contract amounted to the type of "clear, unequivocal, and decisive act[s]" required to establish waiver. *See Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998) (quoting *Ross v. Swan*, 7 Lea, 468) (explaining the difference between equitable estoppel and waiver).

"workmanlike" manner. Mr. Madden conceded at trial that the terms expeditious and workmanlike conveyed "fast" performance and good quality work in compliance with applicable plans, specifications, codes, and regulations. The trial court did not make a specific factual finding on this issue, but did find that GGAT controlled the pace and schedule of the project.

After reviewing the record, we find that GGAT failed to show how Madden Phillips improperly manned or equipped the work site. GGAT relies on Madden Phillips' daily log for the project as demonstrating the lack of resources dedicated to the project and numerous equipment failures. GGAT devotes several pages in its brief to explaining these various failures. It is clear that Madden Phillips suffered setbacks throughout the project, but Madden Phillips presented evidence at trial that equipment failures normally occur on the job site and that the equipment failures at Germantown Manor did not unduly delay Madden Phillips' performance.

The following exchange between Mr. Madden and counsel at trial directly addresses this issue:

> Q:   Other than these typical equipment failures that you're telling us about that you would expect that you had on the Germantown Manor Subdivision, what unusual equipment failures did you have?
>
> A:   Nothing unusual.
>
> Q:   What equipment failures did Madden Phillips experience that delayed this job in any manner?
>
> A:   None.

GGAT has done little to show that Madden Phillips suffered anything other than normal setbacks. Likewise, we are unable to find evidence to show that Madden Phillips failed to provide sufficient manpower to the site to complete the contract as contemplated by the parties.[11] In the absence of such proof, we find in favor of Madden Phillips on this issue. We conclude that Madden Phillips did not fail to adequately man and equip the project in breach of the parties' contract.

### iii. Timely performance.

GGAT further argues on appeal that Madden Phillips materially breached the parties' contract when it failed to complete the project within eight months. GGAT raised two related issues

---

[11]The record indicates to the contrary that the project proceeded roughly at the pace the parties initially contemplated. Mr. Phillips testified that Madden Phillips forty-five day suspension of performance during the summer months caused a delay in completion equal to four or five months in later months. GGAT agreed with this assessment. The facts in the record suggest that Madden Phillips would have likely completed the project within about twelve to fourteen months. Madden Phillips appears to have staffed the project sufficiently to perform within the eight month period agreed upon as a reasonable time for completion absent the suspension delay and other delays that GGAT caused.

-15-

in its brief: 1) Whether the trial court erroneously concluded that the contract between GGAT and Madden Phillips to complete Germantown Manor did not contain a time limit; and 2) Whether the trial court erred when it ruled that the parties' oral modification of their written contract removed the earthwork scope of work from the agreement.

The trial court found that the parties' contract did not contain a date for completion, an amount of time for completion, or a "time is of the essence" provision. The trial court further found that GGAT, by its actions and inactions, waived any right to terminate Madden Phillips for failure to perform under a time-based provision. The court's findings explained that:

> GGAT, as owner of the project, controlled the pace and schedule of the project by not timely providing fill material for Madden Phillips to spread and compact pursuant to the parties' oral agreement. There was uncontradicted testimony at the trial of this cause that over one-third (1/3) of all fill material needed for the project was not imported until January of 2005, only three months before GGAT terminated Madden Phillips from the project.

GGAT offers several arguments in support of its position that the contract contained a time limit. GGAT contends that the trial court's rulings are incomplete, explaining that the findings below did not address the fact that Madden Phillips drafted the parties' contract or the applicable legal rule construing contractual ambiguities against the drafter. GGAT points to what it contends is ambiguous language in the contract that required Madden Phillips to perform in an "expeditious fashion to coincide with the completion schedule of the Owner." GGAT contends that the trial court should have construed the contract's ambiguous terms in its favor as the non-drafting party. GGAT further argues that parol evidence offered to supplement the meaning of the terms at issue showed that the parties specifically discussed six to eight months as the time for completion.

Notably, GGAT does not argue on appeal that time was of the essence in performance of the contract. GGAT's only reference to a provision making time of the essence is a statement that the trial court's finding that the contract did not contain a "time is of the essence" provision is "irrefutably wrong" and shows the bias of party-prepared findings. GGAT goes on to emphasize its assertion that the parties discussed six to eight months as a time for completion. We believe the appellant has incorrectly equated a provision giving a time or date for completion with a provision or agreement providing that "time is of the essence."

The two types of provisions are distinct and carry different legal consequences. *See Groner v. On-Site Grading, Inc.*, No. E1999-00219-COA-R3-CV, 2000 WL 502843, at *4 (Tenn. Ct. App. Apr. 28, 2000)(*no perm. app. filed*). A party's failure to complete a construction project within a time for completion does not constitute material breach absent a provision making time of the essence. *Shepherd v. Perkins Builders*, 968 S.W.2d 832, 833 (Tenn. Ct. App. 1998) (citation omitted). The existence of an agreement that "time is of the essence" can be shown by "'stipulation, a manifestation of intention from the contract or subject matter involved, or an implication from the nature of the contract or circumstances of the case.'" *Groner*, 2000 WL 502843, at *4 (quoting

*Commerce St. Co. v. Goodyear Tire & Rubber Co.*, 215 S.W.2d 4, 11 (Tenn. Ct. App. 1948)). "Generally, time is not of the essence of a building and construction contract." *Shepherd*, 968 S.W.2d at 833 (citation omitted). Thus, a party to a construction contract will not establish that time is of the essence solely by showing that a contract contained a time or date for completion and nothing more. Even if the parties' contract provided that time was of the essence, GGAT waived strict performance of the contract.

GGAT's argument fails on this issue regardless of whether the contract contained a time for completion or provided that time was of the essence. Tennessee law recognizes that a party may waive its right to insist on strict performance of a contractual provision impliedly by conduct. *Harlan v. Hardaway*, 796 S.W.2d 953, 959 (Tenn. Ct. App. 1990). This principle applies to the time within which a party must complete contractual duties. *Id.* A promissee may not terminate a contract and sue for breach when the promissee waived or caused the promisor's delay of performance. *See Tenn. Fertilizer Co. v. Int'l Agric. Corp.*, 243 S.W. 81, 84 (Tenn. 1922); *Friedman v. Georgia Showcase Co.*, 183 S.W.2d 9, 13 (Tenn. Ct. App. 1944) (citing *Petway v. Loew's Nashville & Knoxville Corp.*, 117 S.W.2d 975, 980 (Tenn. Ct. App. 1938)); *see also* 8 Catherine M.A. Mc Cauliff, *Corbin on Contracts*, § 40:5, at 545 (Joseph M. Perillo ed., rev. ed. 1999). This Court has previously found waiver of time for completion in construction cases. *See Alexander & Shankle, Inc. v. Metro. Gov't of Nashville and Davidson County*, No. M2006-01168-COA-R3-CV, 2007 WL 2316391, at *9 (Tenn. Ct. App. Aug. 13, 2007)(*no perm. app. filed*); *Laudlin Corp. v. Concord Props., Inc.*, No. 03A01-9502-CH-00047, 1995 WL 511947, at *4 (Tenn. Ct. App. Aug. 30, 1995).

This Court in *Alexander & Shankle, Inc. v. Metropolitan Government of Nashville and Davidson County*, No. M2006-01168-COA-R3-CV, 2007 WL 2316391 (Tenn. Ct. App. Aug. 13, 2007), found waiver in a case where the parties agreed initially that time was of the essence and set a date for completion. *Shankle* involved a motion for summary judgment on a breach of contract claim. *Shankle*, 2007 WL 2316391, at *5. The contract at issue provided for the construction of two schools in Davidson County. *Id.* at *1. The contract expressly stated that time was of the essence, and the parties eventually determined a date for substantial completion of the project. *Id.* at *1, 6. This Court in *Shankle* recognized that the city and county government ("Metro") had at all times insisted on completion of substantial performance by the date agreed upon by the parties despite making several changes that would necessarily delay completion. *Id.* at *9. Metro nonetheless allowed work to continue for nearly two weeks after the contractor failed to complete the job on time. *Id.* at *4. During this period, the parties agreed to alter the construction schedule and Metro authorized several subcontractors to proceed on an accelerated schedule. *Id.* at *4. Metro later terminated the contractor for failing to meet the expired deadline. *Id.* at *4. The trial court entered partial summary judgment for Metro, finding that the contractor breached the contract by failing to perform by the specified deadline.

This Court reversed the decision of the trial court, finding a genuine question of material fact as to whether Metro had waived performance under the "time is of the essence" provision. *Id.* at *9. We reasoned that a "non-defaulting party may . . . by conduct indicating an intention to regard the

contract as still in force after the other party's default, waive a provision in the contract making time of the essence." *Id.* (citation omitted). "Thus, an owner, knowing construction will not be completed before the deadline, who allows the contractor to continue working after the deadline and encourages the contractor to finish the job, waives his right to terminate under a 'time is of the essence' provision." *Id.* (citation omitted).

We now hold that GGAT, by its conduct, both caused Madden Phillips' delay on the Germantown Manor project and waived any right to completion of the contract within a specified time. It also waived a right to bring suit under an agreement making time of the essence. Implicit in our finding is reliance on the trial court's conclusion that GGAT had a duty to provide fill material pursuant to the oral modification of the parties' contract and that GGAT's delayed delivery of fill material prevented Madden Phillips' timely performance. The trial court found that:

> Madden Phillips' testimony as to the parties' oral agreement modifying the parties' contract is more credible and that after the oral modification of the contract, GGAT, as owner of the project, was responsible for importing all fill dirt necessary for the project, whether such dirt could be purchased from Madden Phillips or not.

GGAT contends that it did not delay Madden Phillips' performance. GGAT argues that the oral modification of the parties' contract prior to Madden Phillips' return to the work site changed only the calculation of payment due. GGAT states that the parties did not remove Madden Phillips' duty to perform the entire earthwork scope of work listed in the written contract, but merely changed payment from a lump sum to a time-and-material basis. It is GGAT's position that Madden Phillips was responsible for the import of fill material under the parties' oral modification.

The evidence in the record does not show by clear and convincing evidence that the trial court's credibility-based finding is erroneous. Appellate courts will not disturb factual findings based on witness credibility unless clear and convincing evidence proves the finding erroneous. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). We accord higher deference to a trial court's resolution of disputes hinging on credibility because trial courts are in the best position to observe witness testimony and evaluate witness demeanor. *Id.* Because the chancellor had the opportunity to observe the parties' testimony on this disputed issue of fact, GGAT must show by clear and convincing evidence that the parties did not agree to place the duty to provide fill material on GGAT.

Mr. Tagg's testimony does not clearly and convincingly show the trial court's finding to be in error. Several of Mr. Tagg's statements at trial were consistent with the testimony of Madden Phillips' representatives that the parties orally agreed to place the burden of supplying fill material on GGAT. Mr. Tagg had the following exchanges with opposing counsel at trial:

> Q:      In fact, once the parties removed this earthwork scope from the contract and agreed that there would be *some dirt* sold by Madden Phillips anyway at whatever price the parties agreed to, any and every dump truck of dirt sold to

-18-

GGAT Development would also be above and in addition to those lump sum items listed in the contract, wouldn't it? (Emphasis added.)

A:      Yes, sir.

. . . .

Q:      Now, once the parties reached that oral agreement, Mr. Tagg, that oral agreement was for that earthwork section and scope of work we saw in the contract to be completely removed from the contract. Is that right?

A:      Yes, sir.

Q:      And then secondly, the parties agreed that Madden Phillips would be paid by an hourly rate to spread dirt around. Correct?

A:      To do the work, yes, sir.

Q:      Certainly those hourly fees that Madden Phillips would be paid to spread the dirt around would not be any compensation for them bringing any dirt in, would it?

A:      I'm not sure of your question. Please ask that again.

Q:      I'll rephrase it. What I'm getting at here is, the oral agreement was for Madden Phillips to be paid an hourly rate to perform the earthwork as in spreading, cutting, moving that dirt around, and compacting in. Correct?

A:      Well, yes, sir . . . .

Mr. Tagg later testified that he was actively bringing in dirt to the site in addition to the fill material Madden Phillips provided. Mr. Tagg's testimony and the transactions between the parties are consistent with the trial court's finding that GGAT had a duty to provide fill material and that the parties entered into subsequent agreements to provide fill material from other sites.

The trial court concluded that GGAT's failure to arrange timely delivery of fill material for which it was responsible caused a substantial delay in the completion of the project. The record supports the trial court's conclusion. Mr. Madden explained the effect of GGAT's failure to timely deliver dirt to the project in his testimony:

It delays everything. It snowballs. If the dirt is not there up to grade, you can't get the sewer in. You can't get the storm drain in. If the dirt is not there, you can't get

the curb and gutter in. You can't get the project expedited. You can't go with the project until you get the dirt in to get it there.

Mr. Phillips echoed these sentiments.

The trial court added that GGAT's failure to make proper arrangements for the removal of trees and relocation of utilities also delayed Madden Phillips' performance. The evidence supports the trial court's finding. At trial, Mr. Tagg agreed that it was GGAT's responsibility to make arrangements with MLGW to remove and relocate utility poles on the site. Mr. Madden's testimony shows that the poles were not relocated until March 2005. The evidence presented at trial also showed that Mr. Tagg made an oral request to the City of Germantown ("Germantown") on January 25, 2005, to alter the site plans to allow certain trees to remain. Germantown denied Mr. Tagg's request on January 28, 2005. The trees were removed sometime thereafter in 2005.

The evidence supports, and does not preponderate against, the trial court's finding that GGAT controlled the pace and schedule of completion. As Mr. Phillips explained, "[E]ight months into the project we're still waiting on trees to be moved. We're still waiting on dirt. We're still waiting on gas lines. We're still waiting on all this stuff that was under the control of the developer." The trial court's finding is consistent with our conclusion that Madden Phillips did not fail to properly man or equip the project.

We conclude that the parties' oral modification removed the earthwork scope of work from their contract and shifted the burden of providing all fill material to GGAT. Because GGAT's inability to timely provide fill material delayed Madden Phillips' performance under the contract, we find that GGAT cannot rely on Madden Phillips' obligation to complete the contract in a timely fashion as a source of breach, material or otherwise. We also find that GGAT's acceptance and encouragement of performance beyond the alleged date for completion waived any right to terminate Madden Phillips on that basis. Madden Phillips did not breach the parties' contract when its performance extended beyond eight months.

We further note that Madden Phillips did not breach by failing to perform within a reasonable time. Madden Phillips owed GGAT a duty to complete the project within a reasonable time regardless of whether the contract contained a date for completion. This Court has previously recognized that a party to a contract who allows an obligor to continue performance beyond an agreed date for completion may not terminate the obligor for such failure, but may nonetheless require the obligor to complete performance within a reasonable time. *Petway v. Loew's Nashville & Knoxville Corp.*, 117 S.W.2d 975, 980 (Tenn. Ct. App. 1938). If there is no agreed date for completion, courts may imply a reasonable time for performance. *Minor v. Minor*, 863 S.W.2d 52, 54 (Tenn. Ct. App. 1993). The parties in this case agreed that eight months was initially a reasonable time for completion. GGAT's actions altered the circumstances attending performance such that eight months was no longer a reasonable time for completion. We conclude that Madden Phillips was on schedule to complete the project within twelve to fourteen months, which was a reasonable time for completion given the circumstances.

## iv. Repair work.

The next alleged material breach is Madden Phillips' defective performance and request for additional compensation related to a section of road that did not pass a proof-rolling test.[12] GGAT argues that it had no duty to pay Madden Phillips to correct Madden Phillips' defective work. Mr. Tagg testified that Madden Phillips provided, spread, and compacted the defective dirt that gave rise to the need for soil cement. Mr. Tagg testified that he and a soil engineering firm tested each load of fill material he brought to the work site. Madden Phillips admits that it spread the dirt, but alleges that GGAT provided the sub-standard dirt. The trial court made no factual finding on this issue.

This particular dispute again highlights the nature of the parties' disagreements. As Mr. Tagg candidly explained at trial, "[t]here are three sides to each story. There's your side and there's my side and there's the truth." This issue again pits Mr. Tagg's testimony against the testimony of Madden Phillips' representatives. Because the trial court resolved all credibility-related determinations in favor of Madden Phillips, we side with Mr. Phillips' account of who supplied defective dirt. He pointedly testified that another company delivered the defective dirt from a construction site at Lausanne School and that he personally attempted to cure the dirt's deficiencies.

We must then consider who is ultimately responsible for repairs necessitated by Madden Phillips' use of GGAT's defective dirt. Mr. Phillips agreed at trial that Madden Phillips had the responsibility to construct and properly compact the roads, but asserted that it was not responsible for defects caused by bad dirt. GGAT argues that Madden Phillips had a duty to reject defective dirt and notes that Madden Phillips did not notify GGAT of any complaints it had with the dirt. The original contract provided only that GGAT was responsible for testing of fill material, which Mr. Tagg allegedly performed.

We do not find Madden Phillips' use of the defective dirt that Mr. Tagg supplied or request for additional compensation to repair a minor defect caused by both parties to amount to a material breach under the facts of this case. Tennessee courts have applied several different tests to determine the materiality of a parties' breach. *See* 22 Steven W. Feldman, *Tennessee Practice: Contract Law and Practice* § 11:13 (2006) (discussing cases). The clear trend in Tennessee is to apply the test found in section 241 of the Restatement (Second) of Contracts. *See, e.g.*, *State v. Howington*, 907 S.W.2d 403, 410-411 (Tenn. 1995); *DePasquale v. Chamberlain*, 282 S.W.3d 47, 53-54 (Tenn. Ct. App. 2008); *Adams TV of Memphis, Inc. v. ComCorp of Tenn., Inc.*, 969 S.W.2d 917, 921 (Tenn. Ct. App. 1997). The factors found in the Restatement (Second) are:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

---

[12]Mr. Madden explained that "soil cement" is cement mixed with the soil on site to make a road base. "Proof-rolling" describes the process by which heavy machinery is driven on the road to determine whether any weak spots exist before the roads are soil-cemented. If the machinery sinks or "pumps," it becomes necessary to patch the road by digging out dirt from the weak section and replacing it with extra soil cement.

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981).

GGAT's argument for material breach fails upon analysis of the Restatement factors. The first two factors are the most significant. Mr. Tagg stated that the requested change order required GGAT to pay an additional $5,000 to soil cement the patch of road at issue. This represented a minor repair on a contract worth over half-a-million dollars. The potential loss caused by Madden Phillips' alleged defective performance was clearly a minor benefit under the contract and one for which Madden Phillips could adequately compensate. The fourth Restatement factor also weighs in favor of Madden Phillips. Nothing in the record indicates that Madden Phillips would not cure its alleged defective performance if the parties failed to agree on a change order. The record instead shows that the parties resolved various disputes arising out of the contract's performance throughout the project.

The fifth and final factor in our analysis gives us no hesitation. Madden Phillips' request for a change order did not violate the standard of good faith and fair dealing implied in Tennessee contracts and relevant under the Restatement factors. The standard of good faith and fair dealing under Tennessee law is fairly flexible and depends upon the facts of each case. *See Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996) (quoting *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987)). Parties are presumed to know the law, but courts will impose a duty that is "fair and reasonable" in consideration of the individual contract. *Tomlin*, 743 S.W.2d at 173. The record shows that Madden Phillips in good faith requested a change order to correct defective performance for which it believed it was not responsible. Madden Phillips used the same procedure throughout the parties' contractual relationship to make similar requests. On many occasions, GGAT agreed that additional compensation was appropriate. Considering all factors, we find that Madden Phillips did not violate its duty of good faith and fair dealing. Our analysis of the Restatement factors shows that Madden Phillips did not materially breach the parties' contract when it constructed the road with dirt that Mr. Tagg supplied or when it requested a change order to repair the work.

GGAT, on the other hand, materially breached the parties' contract when it terminated Madden Phillips without notice of its alleged breach and an opportunity to cure. Parties to a

construction contract in Tennessee must normally give their contractors or subcontractors a reasonable opportunity to perform. *See Carter v. Krueger*, 916 S.W.2d 932, 935 (Tenn. Ct. App. 1995); *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 198 (Tenn. Ct. App. 1990) (citation omitted). Courts sometimes interpret this obligation to require notice to a defaulting party and an opportunity to cure defective performance. *See McClain*, 806 S.W.2d at 198. Courts will often imply this obligation even where the parties do not expressly require notice in their contract. *Id.* (citing 3A Arthur Linton Corbin, *Corbin on Contracts* § 725 (1964)). "Notice ought to be given when information material to the performance of a contract is within the peculiar knowledge of only one of the contracting parties." *Id.* The implied notice requirement serves an important purpose: "Requiring notice is a sound rule designed to allow the defaulting party to repair the defective work, to reduce the damages, to avoid additional defective performance, and to promote the informal settlement of disputes." *Id.* (citations omitted). Failure to give required notice operates as a material breach of the contract. *Id.* at 198-99.

We find that, under the present facts, GGAT owed a duty to notify Madden Phillips of its alleged defective performance and to provide it with an opportunity to cure. The trial court found that GGAT did not meet this obligation. We agree. GGAT should have informed Madden Phillips of its belief that Madden Phillips materially breached the contract by using defective dirt to build a road base. GGAT should have likewise raised any other issues it had with Madden Phillips' alleged failures to equip the project, man the work site, and timely proceed under the contract. None of these alleged material breaches is apparent under the written terms of the contract. Madden Phillips had no reason to know of these alleged breaches. GGAT therefore should have given notice and offered Madden Phillips an opportunity to cure its alleged defective performance. By summarily terminating Madden Phillips without notice, GGAT has not provided Madden Phillips with a reasonable opportunity to perform the contract. GGAT's wrongful termination of Madden Phillips amounts to material breach of the parties' contract.

### v. Defective work.

GGAT's final argument for material breach is Madden Phillips' alleged defective work on the project. Our analysis of this issue is complicated somewhat by the fact that GGAT discovered the alleged defective work only after it terminated Madden Phillips. We do not need to address the question of whether a party who terminates a contractor must allow the contractor to return to the site to cure defective performance. Under the facts of the present case, GGAT did not have a duty to give notice and opportunity to cure the defects discovered after termination. The defects discovered after termination were not within the peculiar knowledge of GGAT. Madden Phillips, as the party who constructed the defective items, should have known of its alleged failures at the time of construction. GGAT had no reason to learn of Madden Phillips' defective performance until Germantown inspected the site. We do not believe GGAT owed a duty of notice under this narrow set of facts

The question then turns to whether Madden Phillips materially breached the parties' contract by defectively performing before it was wrongfully terminated. GGAT alleged that Madden Phillips'

defective work included the installation of a manhole at the northwest corner of the project and the construction of a detention pond. The trial court found that Madden Phillips did not perform defective work. The trial court specifically noted the testimony of Bob Joralemon ("Mr. Joralemon"), inspector for Germantown. Mr. Joralemon testified that an inspection he conducted shortly after Madden Phillips' termination revealed that only "punch list" or minor corrective work was left to be performed. Mr. Joralemon also stated at trial that Madden Phillips' work "was probably about average. You know, I wouldn't say it was – overall it wasn't anything better or worse than we normally see." Raymond James Federico ("Mr. Federico"), a licensed contractor from Northwest Contracting Services, agreed that all the work his company performed at Germantown Manor after Madden Phillips' termination was typical punch-list, dress-up work that every contractor undertakes before completion of a project, with the exception of one defective manhole.

We initially conclude that the evidence does not preponderate against the trial court's findings, reserving for discussion the issue of the detention basin and manhole. Testimony at trial indicates that the majority of the alleged defective work discovered after GGAT terminated Madden Phillips was customary punch-list work. The testimony indicates that Madden Phillips' performance with respect to these items met the industry standard and otherwise comported with the terms of the contract. The parties' contract expressly envisions Madden Phillips' return to the work site to complete the punch-list work. The record further shows that Madden Phillips reserved funds in its budget to complete corrective work. We find no indication that Madden Phillips breached the contract with respect to the normal punch-list items discovered by Germantown during its inspections.

Testimony specific to the construction of a detention basin and manhole raises more difficult questions. We will first address the detention basin. A letter introduced at trial from Germantown to GGAT's engineers showed that the detention basin was not built to plan specifications. Mr. Tagg testified that he had to pay $7,163.75 to dig out and reshape the basin in accordance with the original plans. Mr. Tagg placed the responsibility for the construction of the detention basin on Madden Phillips. Madden Phillips agreed that the detention pond was not constructed properly, but placed blame for the resulting deficiencies on Mr. Tagg. Mr. Madden testified that construction of the detention basin occurred after the parties removed Madden Phillips' duty to provide erosion control from the contract. Mr. Madden explained that GGAT's failure to install sod and a silt fence to prevent water from washing into the basin allowed the rain to wash major amounts of the banks away. Mr. Madden also stated that his men worked by the hour in accordance with the directions of Mr. Tagg during the construction of the detention pond. Mr. Madden explained that Mr. Tagg decided not to dig the basin according to the original specifications, not Madden Phillips.

The trial court found that the parties orally agreed to remove erosion control and all other earthwork scopes of work from the contract. The trial court found that the parties agreed that Madden Phillips would perform subsequent earthwork on an hourly basis with additional charges for equipment not originally listed in the parties' contract. The trial court also found that the testimony of Madden Phillips' representatives was more credible on the oral modification of the contract.

-24-

The responsibility to correctly install the detention pond appears to rest with the party responsible for erosion control under the contract. Mr. Tagg did not present clear and convincing evidence that would justify overturning the trial court's finding that the parties' oral modification removed erosion control from the contract. Because Mr. Madden's testimony is more consistent with the trial court's finding, we conclude that Madden Phillips constructed the detention pond according to Mr. Tagg's directions and that Mr. Tagg failed to properly install sodding and silt fencing. In light of these facts, we cannot ascribe breach to Madden Phillips based on the detention basin's resulting noncompliance with the original plans.

The last alleged defectively constructed item is a manhole and inlet at the northwest corner of Germantown Manor. The trial court found "no evidence that construction of the subject manhole by Madden Phillips constituted material breach." Its findings noted that the testimony of Mr. Federico from Northwest Contracting Services established only that his company may not have dug far enough to find the alleged missing concrete bottom and that the manhole may not have had a concrete bottom. The trial court found that Madden Phillips' witnesses testified that Madden Phillips properly constructed the manholes with concrete bottoms. The trial court further stated an engineering error on the part of GGAT's engineer caused the redesign of the manhole.

We agree with the trial court's finding that GGAT did not establish evidence of a material breach with regard to the construction of the manhole. We find, however, that Madden Phillips breached the contract by not constructing the manhole and inlet as required by the plans and specifications. Not mentioned in the trial court's finding is the fact that plans required Madden Phillips to pour eight inches of reinforced concrete up to a specified level. It is true that Madden Phillips may have poured a concrete bottom, but it is undisputed that it did not pour the concrete bottom according to plans.

We find, however, that Madden Phillips breach of contract did not necessitate the reconstruction of the manhole. Mr. Tagg testified, "[t]he reason why we redesigned the manhole was because the homeowner that lived on Lot 1 of the adjacent subdivision was not happy . . . , not that it was installed wrong. [W]e just didn't like the look of it." Mr. Federico discovered the defective construction only after GGAT decided to redesign the structure. Mr. Tagg testified that GGAT nonetheless encountered additional costs because it had to rebuild the entire manhole due to the absence of a concrete bottom. GGAT did not, however, establish the amount of costs associated with the lack of a concrete bottom. Mr. Federico testified that he did not know how much the replacement of the manhole cost. Mr. Federico estimated that GGAT would have incurred approximately $3,500 in charges to construct a slightly smaller manhole. Assuming $3,500 was attributable to the overall design change, there is no indication of what the design change would have cost if the manhole contained the proper concrete bottom. Regardless, we conclude that under the facts such costs were minimal and Madden Phillips did not materially breach the parties' contract under the relevant Restatement factors.

### C. GGAT's counterclaim

Our analysis reveals that Madden Phillips committed two minor breaches of the parties' contract before GGAT materially breached the contract. Madden Phillips constructed a section of the road base with defective dirt and failed to build a manhole to contract specifications. Because the rule of first uncured material breach bars recovery for *subsequent* breaches, we would normally find it appropriate to remand this case to allow GGAT to establish an amount for recovery based on funds expended to correct these deficiencies. But here GGAT incurred these costs to complete or repair Madden Phillips' defective performance only after it unilaterally terminated Madden Phillips. GGAT denied Madden Phillips the opportunity to correct any defects in its work. We therefore find that GGAT may not recover partial correction costs for extra soil cement due Madden Phillips' use of defective dirt or corrections costs associated with Madden Phillips' failure to install a manhole to specifications. *See McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 202 (Tenn. Ct. App. 1990)(citations omitted).

The rule of first material breach bars recovery on the remaining elements of GGAT's counterclaim. GGAT materially breached the parties' contract when it wrongfully terminated Madden Phillips. Because GGAT waived Madden Phillips' first material breach, GGAT's termination of Madden Phillips serves as the first uncured and otherwise unwaived material breach of the parties' contract. GGAT, as a result, may not recover for damages that arose after termination.

### D. Attorney's fees

GGAT challenges the trial court's decision to award attorney's fees to Madden Phillips under the Prompt Pay Act. The general standard of review applicable to a trial court's decision to award attorney's fees is abuse of discretion. *In re Estate of Greenamyre*, 219 S.W.3d 877, 885 (Tenn. Ct. App. 2005). The same standard applies when a court awards fees under a discretionary statutory provision. *State ex rel. Landenberger v. Project Return, Inc.*, No. M2007-02859-COA-R3-CV, 2009 WL 637122, at *9 (Tenn. Ct. App. Mar. 11, 2009) (*no perm. app. filed*) (citation omitted) (reviewing an award of attorney's fees under Tennessee Code Annotated section 4-18-104(g)(9) (2005), which provided that the court *may* award fees); *Carney v. Crosby*, 255 S.W.3d 593, 602 (Tenn. Ct. App. 2008) (reviewing an award of attorney's fees under Tennessee Code Annotated section 8-47-121 (2002), which likewise provided that the court *may* award fees).

The Prompt Pay Act gives trial courts discretion to award attorney's fees. The pertinent provision states, "[r]easonable attorney's fees *may* be awarded against the nonprevailing party; provided, that such nonprevailing party has acted in bad faith." Tenn. Code Ann. § 66-34-602(b) (2004) (emphasis added). We will therefore review the trial court's decision to award fees under the Prompt Pay Act for abuse of discretion. A finding of abuse of discretion is appropriate only when a trial court "'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (alteration in original) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

We will uphold the trial court's ruling "so long as reasonable minds can disagree as to propriety of the decision made." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000).

The trial court did not abuse its discretion in awarding attorney's fees to Madden Phillips. The Prompt Pay Act provides that "[i]f a contractor has performed in accordance with the provisions of the contractor's written contract with the owner, then the owner shall pay to the contractor the full amount earned by the contractor, less only those amounts withheld in accordance with the provisions of § 66-34-203." Tenn. Code Ann. § 66-34-202(a) (Supp. 2008). A contractor who does not receive payment consistent with the schedule provided for in the parties' contract and within thirty days of timely application for payment may recover under the Act, provided that the contractor notifies the owner of the provisions of the Act and its intent to pursue remedies provided in the Act. Tenn. Code Ann. §§ 66-34-202(a) (Supp. 2008); 66-34-602(a)(1) (2004). A contractor must issue this notice by registered or certified mail, return receipt requested. Tenn. Code Ann. § 66-34-602(a)(2) (2004). An owner's failure to respond within ten days gives rise to claims for equitable relief and attorney's fees. Tenn. Code Ann. §§ 66-34-602(a)(3), -602(b) (2004).

Madden Phillips brought its claim under the Prompt Pay Act based on two outstanding pay applications submitted to GGAT. The parties' contract expressly provided terms of payment. The contract required Madden Phillips to present its invoice to GGAT on or before the twenty fifth of each month. GGAT had a duty to provide payment on submitted applications no later than the twenty fifth of the following month. Madden Phillips submitted its tenth pay application in the amount of $13,612 on March 23, 2005. Madden Phillips submitted its eleventh and final pay application on April 22, 2005, after its termination from the project. The final invoice, which contained charges for work Madden Phillips performed before termination, added $15,878.54 to the outstanding balance for a total of $29,490.54.

GGAT withheld payment on both applications and refused to refund retainage in the amount of $30,180.07.[13] Mr. Tagg testified at trial that he withheld these amounts because he did not believe he owed Madden Phillips any payment. Mr. Tagg said that he terminated Madden Phillips because he was "fed up" with a combination of alleged over-billings, lack of work, lack of manpower, lack of equipment, delay in completion, and a request for additional sums to provide extra soil cement. Madden Phillips offered an opposing view on GGAT's decision to terminate and withhold payment. Mr. Phillips suggested that Mr. Tagg arranged with Germantown to pave the streets of the Germantown Manor subdivision in place of Madden Phillips. On cross-examination, Mr. Tagg admitted to having preliminary negotiations with Germantown while the parties remained under contract. He testified that he did not reach a final agreement with Germantown until after terminating Madden Phillips, but could not recall whether he mentioned the pavement agreement to the contractor before that time. Germantown ultimately supplied the first coat of pavement on the project in exchange for Mr. Tagg's services in widening a street within the subdivision.

---

[13] Neither party addressed whether GGAT had a right to withhold the retainage under the terms of the contract. *See* Tenn. Code Ann. § 66-34-203 (Supp. 2008).

The trial court found that GGAT acted in bad faith and awarded Madden Phillips attorney's fees in the amount of $29,068. The court found that GGAT terminated Madden Phillips without notice or opportunity to cure any alleged defects, without offering grounds for termination, and without paying for services already rendered. In light of the facts presented, the trial court concluded that:

> GGAT willfully attempted to take advantage of Madden Phillips' rights by wrongfully terminating Madden Phillips at a time on the project when Madden Phillips had almost completed all of its work and GGAT attempted to keep the money which was rightfully owed to Madden Phillips. . . . [S]uch action was taken in bad faith . . . .

Tennessee courts have recognized in various contexts that the presence of bad faith is a question of fact. *See, e.g.*, *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 822 (Tenn. 2003) (recognizing that Tennessee Code Annotated section 56-7-105 (2000) expressly provides that the question of bad faith is a factual determination for the jury in refusal to pay cases arising in the insurance context); *Wager v. Life Care Ctrs. of Am., Inc.*, No. E2006-01054-COA-R3-CV, 2007 WL 4224723, at *10 (Tenn. Ct. App. Nov. 30, 2007)(*no perm. app. filed*)(addressing bad faith in a breach of contract action). The Middle Section of this Court has found that the existence of bad faith under the Prompt Payment Act is a factual determination. *Sun Splash Painting, Inc. v. Homestead Village, Inc.*, No. M2002-00853-COA-R3-CV, 2003 WL 22345482, at *2 (Tenn. Ct. App. Oct. 15, 2003) (*no perm. app. filed*) (citing *Tennessee Farmer's Mut. Ins. Co. v. Thompson*, 12 Tenn. App. 591 (Tenn. Ct. App. 1930)). Factual determinations of good or bad faith often turn on credibility and may be entitled to a high degree of deference on appeal. *See Worsham v. Action Realtors, Inc.*, No. 03A01-9412-CV-00428, 1995 WL 238398, at *3 (Tenn. Ct. App. Apr. 21, 1995).

We find insufficient evidence in the record to overturn the trial court's conclusion that GGAT acted in bad faith. Inherent in the trial court's decision that GGAT willfully attempted to take advantage of Madden Phillips is a determination that Mr. Tagg's testimony was not credible on this issue. GGAT has not shown clearly and convincingly that the trial court's determination is in error. The record shows that GGAT intentionally withheld approximately $60,000 for work and materials Madden Phillips had already provided. GGAT took this action after summarily terminating Madden Phillips after it completed ninety percent of the project and shortly before it completed its work under the "roads" scope of work. There is a fairly strong suggestion that GGAT terminated Madden Phillips in order to obtain a favorable deal on the first layer of paving in the subdivision. Further, the majority of objections to the quality of the work under the contract arose only after GGAT wrongfully terminated Madden Phillips and wrongfully withheld payment.[14] In light of these facts,

---

[14]Mr. Tagg suggested that alleged defective work that Germantown discovered in preparing its working punch-list contributed to his decision to withhold payment. The record indicates, however, that Germantown prepared the working punch-list containing the alleged deficiencies on June 28, 2005. Mr. Tagg withheld payment from Madden Phillips well before GGAT obtained notice of any defective work.

we defer to the trial court's finding that GGAT willfully terminated Madden Phillips and withheld payment in bad faith.

GGAT's reliance on this Court's decision in *Trinity Industries, Inc. v. McKinnon Bridge Co.*, 77 S.W.3d 159 (Tenn. Ct. App. 2001), is misplaced. The *Trinity* court recognized that the Prompt Pay Act does not define "bad faith" and determined that acts taken in bad faith involve knowing or reckless disregard for contractual rights or duties. *Trinity*, 77 S.W.3d at 181 (citing *Glazer v. First Am. Nat'l Bank*, 930 S.W.2d 546 (Tenn. 1996)). The non-prevailing party in *Trinity* withheld payment on a shipment of steel after a bridge collapsed, believing that defective steel delivered under the contract caused the collapse. *Id*. at 166. We concluded that the non-prevailing party did not act in bad faith under the facts because we had "no doubt" that the party honestly believed it did not owe the payment claimed and affirmed the trial court's decision to deny attorney's fees under the Act. *Id*. GGAT, unlike the nonprevailing party in *Trinity*, acted in reckless disregard of Madden Phillips' contractual rights. In light of the trial court's findings, we conclude that GGAT did not honestly believe it did not owe Madden Phillips payment. We affirm the trial court's finding of bad faith.

GGAT contends that even if the trial court properly decided that GGAT acted in bad faith, the trial court erred in awarding $29,068 in fees based solely on Mr. Phillips' testimony at the time of trial. GGAT submits that Tennessee law imposes three prerequisites to an award of attorney's fees: 1) a party seeking attorney's fees in any case must first make out a prima facie case for a reasonable amount of fees; 2) a party must at a minimum present an affidavit of the lawyer who performed the work; 3) a party who opposes the request has a right to cross-examine the party's attorney or present its own proof.

The Tennessee Supreme Court summarized the law applicable to a request for attorney's fees in *Nutritional Support Services, Ltd. v. Taylor*, 803 S.W.2d 213 (Tenn. 1991). The *Taylor* court recognized that in cases for attorney's fees under a contractual provision:

> 1) a trial judge may fix fees of lawyers in causes pending or which have been determined by the court, *with or without expert testimony of lawyers and with or without a prima facie showing by the proponent of what a reasonable fee would be*; 2) that if the trial judge fixes a fee based upon the appropriate guidelines, the opponent of the fee *should be accorded full opportunity to cross-examine the proponent and to present evidence on the fee issue.*

*Taylor*, 803 S.W.2d at 216 (citing *Wilson Mgmt. Co. v. Star Distribs. Co.*, 745 S.W.2d 870 (Tenn. 1988)) (emphasis added). The supreme court found it "elementary that the same procedure would apply to the determination of a reasonable attorney fee based upon a state statute." *Id.* at 215. The *Taylor* court further recognized that:

> Opponents of an award of a reasonable fee [will] not be heard to complain of the lack of proof adduced by the proponent of the fee where a case was fully tried in the trial court, the trial judge awarded a reasonable fee, presumptively based upon the

*Connors* factors, and the opponent of the fee failed to request a hearing on the fee or, "convince the appellate courts that he was denied the opportunity to do so through no fault of his own."

*Id.* at 216 (quoting *Kahn v. Kahn*, 756 S.W.2d 685, 697 (Tenn. 1988)).

The Tennessee Supreme Court had previously applied these principles in *Kahn v. Kahn*, 756 S.W.2d 685 (Tenn. 1988), under facts similar to the case at bar. *Kahn* involved a divorce case where the trial court awarded wife attorney's fees in the amount of $20,000. *Kahn*, 756 S.W.2d at 696-97. Wife's attorney at no time offered proof or an affidavit establishing the reasonableness of the charges. *Id.* at 696. The only reference to attorney's fees came during oral arguments after the wife's attorney requested an award. *Id.* The trial court responded by asking wife's attorney to name an amount and the attorney asked for $20,000. *Id.* The husband's attorney in *Kahn* did not raise the fee issue or request a hearing. *Id.* The trial court granted the request of wife's attorney. *Id.* at 697.

This Court reversed the trial court's fee award. *Kahn v. Kahn*, App. No. 86-259-II, 1987 WL 16124, at *9 (Tenn. Ct. App. Aug. 28, 1987), *rev'd,* 756 S.W.2d 685 (Tenn. 1988). We based our conclusion on the supreme court's decision in *Connors v. Connors*, 594 S.W.2d 672 (Tenn. 1980). *Kahn*, 1987 WL 16124, at *9. The *Connors* court established that a trial court has an obligation to "exercise its own judgment and ascertain what sum is a reasonable fee, determined by application of all relevant factors." *Connors*, 594 S.W.2d at 676 (citing *Carmack v. Fidelity-Bankers Trust Co.*, 180 Tenn. 581, 582 (Tenn. 1944)). We interpreted Connors to require trial courts to base an award of attorney's fees in every case on a "fully developed record of the nature of the services rendered and an analysis of the proof using the factors delineated [in the Supreme Court Rules]." *Kahn*, 1987 WL 16124, at *9.

The supreme court rejected our interpretation of *Connors*. The supreme court limited *Connors* to its facts and stated that "*Connors* does not say that a fully developed record of the nature of the services rendered is a prerequisite to an award of an attorney's fee." *Kahn*, 756 S.W.2d at 696. Rather, the court found that:

> Obviously, the trial judge felt that the pendente lite proceedings which had been heard by him, the pre-trial briefs, depositions and the three day trial had sufficiently acquainted him with the factors we delineated in *Connors* to make a proper award of an attorney's fee without proof or opinions of other lawyers. When the trial judge did so, it was incumbent upon husband's lawyer to request a hearing if dissatisfied with the award, or convince the appellate courts that he was denied the opportunity to do so through no fault of his own.

*Id.*

GGAT's contention that the trial court erred in awarding Madden Phillips attorney's fees without presentation of an affidavit or an opportunity to cross-examine suffers from the same

deficiencies as the arguments of the appellant in *Kahn*. We find no indication that the award of attorney's fees is not fair and reasonable under the circumstances. There is no indication that the trial judge's involvement throughout the parties' legal proceedings, including four days of trial, did not sufficiently acquaint him with the factors relevant to the determination of a reasonable award. Similar to the appellant in *Kahn*, counsel for GGAT did not request to present proof and did not request a hearing on the reasonableness of fees.[15] GGAT has not convinced this Court that the trial court denied it the opportunity to make such requests. We conclude that the trial court did not abuse its discretion in awarding $29,068 in attorney's fees and affirm the trial court's award.

## V. Conclusion

We conclude that GGAT materially breached the parties' contract and in bad faith refused to compensate Madden Phillips. We affirm the decision of the trial court, but deny Madden Phillips' request for attorney's fees on appeal. We tax the costs of this appeal to GGAT Development Corporation and its surety for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

---

[15] The record indicates that counsel for GGAT argued against an award of attorney's fees in his closing argument. Counsel first stated that "$29,000 on a $50,000 claim simply isn't reasonable." Counsel later argued, "and again, I don't think there's been any proof that the attorney's fees that have been charged . . . in this case would fall within the definition of reasonable even if they were appropriate in this case." There is no indication that GGAT requested any other action from the trial judge than to find that a fee award of $29,000 was not reasonable. There is also no indication that GGAT did not have the opportunity to cross-examine Mr. Phillips, or counsel if requested, with regard to Mr. Phillips' testimony on the amount of attorney's fees.