IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 5, 2013 Session

# FRANDA WEBB, ET AL. V. FIRST TENNESSEE BROKERAGE, INC., ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 2-548-09      Harold Wimberly, Judge**

**No. E2012-00934-COA-R3-CV - Filed June 18, 2013**

In this appeal, we are asked to determine whether the trial court properly denied the defendants' motion to compel arbitration and to stay proceedings. The defendants assert that Ms. Webb signed an agreement to arbitrate "all controversies" when she opened the brokerage account with them. The trial court determined, inter alia, that the arbitration agreement was not enforceable under state law, that Ms. Webb did not agree to arbitration, and that the account representative fraudulently induced Ms. Webb to enter into the agreement. We affirm the decision of the trial court only as to arbitration; we vacate any findings that go to the merits of the underlying case and remand for further proceedings.[1]

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed in Part and Vacated in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

Mark D. Griffin, Kristine L. Roberts, and William E. Routt, III, Memphis, Tennessee, for the appellants, First Tennessee Brokerage, Inc., and Michael Conaty.

John A. Lucas and Lane E. McCarty, Alcoa, Tennessee, for the appellees, Franda Webb, and D.P., a minor, by and through his legal custodian, Franda Webb, citizens and Residents of Knox County, Tennessee.

---

[1] Our first opinion in this case was filed on April 23, 2013. The appellants thereafter filed a petition to rehear that contained a meritorious assertion. Accordingly, we granted the petition, withdrew our original opinion, and now submit this substitute opinion.

**OPINION**

## I. BACKGROUND

In early 2008, Franda Webb had an account at First Tennessee Bank ("FTB") holding money saved from her earnings as a nurse and as an office administrative worker.[2] According to Ms. Webb, she had set aside these funds to provide for the special educational needs of her son, D.P.[3] She previously had invested the money at issue in FDIC insured FTB certificates of deposit ("CDs") and savings accounts. Seeking higher interest rates, she asked employees at her FTB branch whether there were any safe, conservative investment options that would produce higher income than a savings account or a CD. She was directed to the defendant, Michael Conaty, a financial advisor at First Tennessee Brokerage, Inc. ("FTBR"), FTB's wholly owned subsidiary.

Ms. Webb and her husband, David Everhart, first talked on the telephone with Mr. Conaty on January 8, 2008. According to Ms. Webb and Mr. Everhart, during this conversation, they emphasized to Mr. Conaty the special needs of D.P. and their desire to invest the money to be held for his educational needs. They repeatedly stressed, however, that the principal had to be fully protected and not put at risk. Between that initial call and February 14, 2008, Ms. Webb had several other conversations with Mr. Conaty, but she stated they never discussed any specific investment. She contends that in each of the conversations, she repeatedly emphasized D.P.'s disabilities, that his educational needs were quite expensive, and that she wanted any investment of the funds for him to be totally secure. Ms. Webb stated that Mr. Conaty always assured her, as he had her husband, that he would take special care to make sure that their objectives and D.P.'s needs were met.[4]

Ms. Webb contends that on the morning of February 14, 2008, Mr. Conaty called her to inform her that he had found a suitable investment vehicle – an investment in Lehman Brothers bonds ("the Bonds" or "Lehman Brothers Bonds"). According to Ms. Webb, Mr. Conaty stated: "I have something that I think will suit you just fine. It has an income component to it, it will preserve your princip[al], and it's the safest thing that I've been able

---

[2]The defendants contend that at the time the Bonds were purchased, Ms. Webb and her husband were multi-millionaires and that the amount in the account at issue constituted well below 10 percent of the couple's net worth.

[3]D.P. suffers from severe disabilities and extreme emotional problems. He is in his mid teens, but can only read and write at the second grade level. His special educational needs can only be met through expensive private schooling.

[4]Mr. Everhart's testimony mirrored that of his wife.

to locate for you." Ms. Webb further testified regarding her discussion with Mr. Conaty:

A.       He told me that they were Lehman Brothers bonds; that Lehman Brothers was one of the most secure houses in the United States; that they were old; they were reputable; they were safe; they were paying this high interest rate over six percent[5] on the amount of money that I had to invest; that they would return me almost $19,000 a year. And that there was a one-day window of opportunity for me to invest, and that I would need to make a decision as early as possible.

Q.       Did you understand what he meant by one-day window of opportunity?

A.       To me that meant get it today or you don't get it.

Mr. Conaty acknowledged during his hearing testimony that he told Ms. Webb the Bonds were a "one-day opportunity":

Q.       Now, let's turn to the 14th of February. I take it we can now agree on the fact that you did tell her essentially that these bonds were – in words to this effect, they were a one-day opportunity?

A.       Yes, sir.

* * *

A.       I said she had a one-day opportunity to buy these bonds.

Mr. Conaty went on to explain that because February 14th was the final day of the initial public offering for the Bonds, in his view it was a true statement that Ms. Webb had one day to get the bonds at the offered price.

Later in the day on February 14th, Ms. Webb decided to purchase the Bonds described by Mr. Conaty. Because she understood that she had to purchase the Bonds that day, she went to a branch of FTB and told an employee that she wanted to buy the Bonds Mr. Conaty had recommended to her. Around 4:00 p.m., Ms. Webb met with Mr. Conaty. She testified that she agreed to invest $300,000, emphasizing to him once again that the investment had to be totally secure in order to be available to meet D.P.'s special educational needs. According to Ms. Webb, Mr. Conaty recommended concentrating the entire $300,000 in only

---

[5]The Bonds were offered at 6.25%.

one investment – the Lehman Brothers Bonds. As it was late in the day, Ms. Webb stated she grew concerned that she might miss the "one-day window of opportunity," but Mr. Conaty assured her that she did not have to worry and that he would "take care of that."

To initiate the investment process, Mr. Conaty downloaded a 14-page document from a computer. Ms. Webb recalled that as Mr. Conaty went through the pages, he would ask her questions and fill in the blanks. He handed Ms. Webb the pages that required her signature. The first five pages were the "Personal Brokerage Account Application." Those pages relate to the customer's background and investment objectives and do not contain an arbitration clause.[6] Pages 6 and 7, the "Customer Agreement," are identical. They are the only pages signed where the customer states that he/she has "agreed to the terms set forth in the Customer Agreement herein . . . ." One copy is kept by FTBR; the other copy is the customer's copy. Pages 8-10 and the top of page 11 reflect the "Brokerage Account Customer Agreement." The arbitration clause appears on page 11. Pages 12-14 are not relevant to the present dispute.

According to Ms. Webb, the documents Mr. Conaty gave her to sign did not include an arbitration agreement. She testified unequivocally that she had never seen and did not receive an arbitration agreement and that they never discussed one. Ms. Webb further noted that at no time prior to the collapse of Lehman Brothers did Mr. Conaty or anyone at FTBR give her a prospectus for the Bonds.

Mr. Conaty testified that neither Ms. Webb nor her husband ever told him that the investment was for their son. He noted that Ms. Webb first mentioned D.P. when Mr. Conaty was gathering the account information, but she did not indicate she was investing the money for the benefit of her son. He claimed to not recall whether Ms. Webb told him that she desired a "very safe investment." According to Mr. Conaty, prior to February 14, 2008, he recommended a "variety of investment options" to Ms. Webb, including the Lehman Brothers Bonds at issue. Mr. Conaty specifically related as follows:

Q.      Can you tell the Court anything today that you told her about what risk went along with these bonds?

A.      That these were issued by the Lehman Brothers Corporation; they carried a coupon of six and quarter percent, and I would have mentioned the expiring date. And I'm sure that's – I mentioned that. I don't recall whatever else we talked about.

---

[6]Ms. Webb stated Mr. Conaty answered the questions regarding her purported investment knowledge.

Q. Did you tell her that it could be difficult [to] sell these bonds if she decided she wanted to?

A. No, sir.

Q. Did you tell her there was no established trading market for –

A. I would not have told her that, no, sir.

Q. And you wouldn't have told her, I think you may have earlier, that they weren't listed on any securities exchange. You did tell her that?

A. No, sir.

Q. And did you tell her that there was no assurance that they would ever be sold in the secondary market?

A. I would not have told her that, no, sir.

Q. And you didn't give her a prospectus?

A. No, sir.

Q. And you did not give her any written promotional or sales materials that disclosed the risk, did you?

A. The prospectus and those details were not available at the time.

Q. Well, did you give her any written sales materials that disclosed the risk of bonds just generally?

A. No, sir.

Q. Did you give her any written sales or promotional materials that had caveats or warnings in it about the risk of having 100 percent of this investment in one product?

A. I don't believe I did.

According to Mr. Conaty, after the documents were completed, Ms. Webb took all 14

pages home with her, as the account was apparently initially set up to list her husband as a joint tenant, and Mr. Everhart's signature was required. The defendants note that Ms. Webb therefore had the rest of the day and night to review the documents. The following day, Ms. Webb appeared at the FTB branch, gave the documents to an employee with instructions to send them to Mr. Conaty, and drafted a note to Mr. Conaty that indicated she desired the account to be opened as an individual account in her name only rather than a joint one. The FTB employee sent the materials to Mr. Conaty's office via fax and interoffice mail.

Over the months that followed the purchase of the Bonds, other than providing a monthly account statement in the mail, FTBR and Mr. Conaty never advised Ms. Webb to cut her losses and sell the Bonds. Ms. Webb stated that Mr. Conaty assured her the investment was safe.[7] After the bankruptcy filing by Lehman Brothers on September 14, 2008, the majority of Ms. Webb's investment was lost.

Prior to filing this action, Ms. Webb went to FTBR twice to retrieve copies of the account documents in her file. In late July 2009, she requested her entire file from Mr. Conaty's office. She was given seven pages. No arbitration agreement was included in the pages she received. Further, upon reviewing the file, Ms. Webb realized that there was a gap in the numbered pages. She thereafter returned to FTBR to again ask for her complete file. FTBR responded that it did not have any additional documents related to her account. Thus, no copy of the arbitration agreement was in Ms. Webb's file.[8]

After Ms. Webb initiated this lawsuit, the defendants filed a motion to compel arbitration. The trial court conducted two extensive hearings on the motion. Ms. Webb testified that she did not understand that the Bonds were just promissory notes by Lehman Brothers. She related that she did not know what "par" meant and she had no grasp of the relationship between risk and reward. She told the court the following:

> Q.    If it had been disclosed to you that these bonds were a more risky
>         investment than your certificates of deposit, would you have signed an

[7]The defendants note that in early September 2008, Ms. Webb worked with Mr. Conaty to use her FTBR brokerage account to post a bond in connection with a lawsuit. They observe that by this action, she subjected the account to loss pending the outcome of the litigation. The defendants contend that it was only after this lawsuit was instituted that Ms. Webb claimed D.P. had some interest in the account.

[8]According to the defendants, it was their customary practice to provide the customer with a copy of the entire account document once it was completed, excepting only duplicative brokerage copies of the Customer Agreement and certification of disclosure, and to maintain for FTBR's records only those pages executed or otherwise filled out by the customer. Accordingly, pages one through six and page 12 were the only pages kept in Ms. Webb's file by FTBR.

account agreement with First Tennessee Brokerage?

A.    No, sir.

Q.    Okay.  On that, do you understand -- tell the Court, what is your understanding about the correlation in investments between risk and reward?

A.    I have no understanding of that as it relates to investments or accounts or stuff.

Q.    Did you have any understanding from your conversations with Mr. Conaty or anyone else, that by investing in Lehman Brothers notes or bonds with a higher interest rate, that that was a more risky investment than your CDs had been?

A.    No, sir.

Q.    You didn't know that?

A.    No.  He did not explain anything to me about the risk.  He kept telling me how safe they were; what a good house Lehman Brothers was; what a good return; that it met everything that I needed for [D.P.].

Q.    If you had known that you could have purchased these bonds after February 14th or 15th, how would that have affected your decision to sign this document?

A.    I would have waited until David [Everhart] got home and we could look it up and we could find out more about it.

The lengthy order denying the defendants' arbitration request was issued on March 30, 2012, and provided as follows:

**The claims against Mr. Conaty are not arbitrable.**

1.  The claims against the Defendant Michael Conaty ("Conaty") are not arbitrable for the following reasons:

a.  Conaty is not a party to the alleged arbitration agreement.  The arbitration

-7-

clause relied upon by the Defendants provides as follows:

> All controversies that may arise between Customer and FTBR (including, but not limited to controversies concerning any brokerage account, order or transaction, or the continuation, performance, interpretation or breach of this or any other agreement between Customer and FTBR, whether entered into or arising before, on or after the date this account is opened) shall be determined by arbitration in accordance with the rules then prevailing of the New York Stock Exchange, Inc., or FINRA, Inc.,[9] as Customer may designate. If Customer does not notify FTBR in writing of Customer's designation within five (5) days after Customer receives from FTBR a written demand for arbitration, then Customer authorizes FTBR to make such designation on Customer's behalf. Customer understands that judgment upon any arbitration award may be entered in court of competent jurisdiction.

b. On its face, the arbitration clause does not require arbitration of controversies between the customer and a sales representative such as Mr. Conaty and does not include agents, employees or sales representatives such as Mr. Conaty. "FTBR" is defined in multiple places in the agreement as First Tennessee Brokerage, Inc. This omission contrasts sharply with agreements used by other brokerage firms. *See, e.g.*, Morgan Keegan New Account Client Agreement (Tab 4 to Exhibit 15) ("You agree and, by accepting, opening or maintaining any account for you, Morgan Keegan agrees that all controversies between you and Morgan Keegan (or any of Morgan Keegan's present or former officers, directors, agents, or employees) . . . shall be resolved by arbitration."); Schwab One Brokerage Account Application (tab 6 to Exhibit 15) ("This arbitration agreement will be binding upon and inure to the benefit of the parties hereto and their respective representatives, attorneys in-fact, successors, assigns and any other persons having or claiming to have legal or beneficial interest in the Account, including court-appointed trustees and receivers.").

c. The Defendants rely upon p. 12 of Exhibit 3 which reads as follows: "I am purchasing a product from a representative of First Tennessee Brokerage, Inc. (FTBR). The Court finds, however, that as a matter of contract construction,

---

[9][Financial Industry Regulatory Authority].

this reference to "FTBR" does not include account representatives such as Mr. Conaty for several reasons. First, the context shows that "FTBR" refers to First Tennessee Brokerage, Inc. Even if the document is ambiguous, the ambiguity must be construed against the drafter, FTBR. Moreover, the following sentences on the same page make clear that "FTBR" refers to the corporation, not to individual representatives: "FTBR, a wholly owned subsidiary of FTB, is a member of the FINRA and SIPC . . . . First Horizon Investment Services is a division of FTBR." Similarly, another paragraph on the same page makes clear that FTBR and its registered representative are not the same: "FTBR and its registered representatives will receive compensation in connection with the sale of mutual funds to its customers. Compensation to FTBR *and/or its registered representatives* may vary depending upon the specific mutual fund investment purchased." (emphasis added). Finally, as noted above, "FTBR" was defined previously in the same document to include only First Tennessee Brokerage, Inc., not account representatives. Those definitions all precede the arbitration clause relied upon by FTBR. The language on p. 12, however, follows the arbitration clause.

d. There is a lack of mutuality in that there is nothing in the alleged arbitration agreement that would require Mr. Conaty to arbitrate all disputes with Ms. Webb. Because of this lack of mutuality, the Plaintiffs cannot be forced to arbitrate their claims against Conaty. *C.O. Christian & Sons Co. v. Nashville P.S. Hotel, Ltd.*, 765 S.W.2d 754, 757 (Tenn. Ct. App. 1988) ("An arbitration clause does not bind one not a party to the contract. An arbitration agreement does not bind either party unless both parties are bound.").

e. Because Conaty was not a party to the arbitration agreement, the claims against him are not required to be arbitrated. *Frizzell Constr. Co. v. Gatlinburg, LLC*, 9 S.W.3d 79, 84 (Tenn. 1999); *C.O Christian & Sons Co. v. Nashville P.S. Hotel, Ltd.*, 765 S.W.2d 754, 757 (Tenn. Ct. App. 1988); *River Links at Deer Creek, LLC v. Melz*, 108 S.W.3d 855, 860 (Tenn. Ct. App. 2002); *Lee Brown and GutterShutter of Nashville, LLC v. David Styles*, (TCA Nashville, No. M2010-024-3-COA-R3-CV, August 18, 2011).

f. FTBR gave a deposition pursuant to Rule 30.02(6), T.R.C.P., in which its designated representative [Paul H. Mann, President and Chief Compliance Officer] testified unambiguously that claims against account representatives such as Conaty were not required to be arbitrated:

Q. Does this agreement require arbitration of claims against

account representatives?

A.    No.

Mann. Dep. at 30.

Q.    Is it First Tennessee's position that claims relating to brokerage accounts that are made against account representatives are required to be arbitrated?

THE WITNESS:  No.

*Id.* at 39.

At the hearing, Mr. Mann testified that he had misunderstood the question. *See* Transcript of October 14, 2011 hearing at 180.  However, the Court does not accept that testimony.  The questions noted above are clear and unambiguous on their face.  In addition, the Court noted that Mr. Mann first claimed that this testimony was a mistake and that he had misunderstood the question only after taking a break and consulting with counsel.  Mr. Mann claimed in his testimony at the hearing that he "knew as soon as I answered it, it was incorrect."  Transcript at 178.  His deposition testimony, however, refutes this testimony.  After first testifying very clearly that the agreement did not require arbitration of the claims against account representatives, 9 pages later he testified consistent with his first answer that FTBR's position was that claims against account representatives were not required to be arbitrated.  It was only after that testimony that a break was taken, Mr. Mann consulted with counsel, and then changed his testimony.

For the next 10 pages of his deposition, he was questioned about this change in testimony.  Mann Dep. at 41-51.  Suffice it to say that in spite of numerous (17) objections by his counsel, Mr. Mann could not defend his abrupt change of position or reconcile it with the language of the agreement, including the repeated definitions of "FTBR."

**The alleged arbitration agreement is not enforceable under Tennessee law.**

2.   As discussed below, the Court finds that Ms. Webb did not sign an arbitration agreement with FTBR.  Even if she had signed the agreement as contended by FTBR, however, it is not an enforceable arbitration agreement

under Tennessee law for the reasons set forth below.

**An unconscionable contract of adhesion.**

3.   The alleged arbitration agreement in this case clearly is a contract of adhesion.   It was a standard form agreement prepared by First Tennessee Bank's in-house attorneys.  Transcript at 154.  It was presented to customers on a take-it-or-leave-it basis.  If the customer did not sign FTBR's form, FTBR would not do business with them.   Transcript at 71-73.   There was no bargaining over the terms of the contract; the agreement is not something that a customer can negotiate with FTBR.   *Id.* at 54-55.   *Hill v. NHC Healthcare/Nashville, LLC*, 2008 Tenn. App. LEXIS 265 (Tenn. Ct. App. April 30, 2008); *Brown v. Karemor Intl., Inc.*, 1999 Tenn. App. LEXIS 249 (Tenn. Ct. App. 1999) (A contract of adhesion is a "standardized contract form offered to consumers of goods and services on essentially a 'take-it-or-leave-it' basis, without affording the consumer a realistic opportunity to bargain."); *Buraczynski v. Eyring*, 919 S.W.2d 314 (Tenn. 1996).

4.  When the Court is faced with contracts of adhesion such as the one at issue here, the Court must "closely scrutinize" such contracts to determine if they include terms that are "unconscionable or oppressive." *Raiteri v. NHC Healthcare/Knoxville, Inc.*, 2003 Tenn. App. LEXIS 957 (Tenn. Ct. App. Dec. 30, 2003).  Their enforceability "generally depends upon whether the terms of the contract are beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable." *Howell v. NHC Healthcare - Fort Sanders, Inc.*, 109 S.W.3d 731, 734 (Tenn. Ct. App. 2003).

5.  The burden is on FTBR "to show that the parties actually bargained over the arbitration provision or that it was a reasonable term considering the circumstances." *Brown v. Karemor Intl., Inc.*, 1999 Tenn. App. LEXIS 249 (Tenn. Ct. App. 1999).  FTBR has not carried this burden.

6.  In determining whether an arbitration provision is enforceable, in *Raiteri*, supra, the Tennessee Court of Appeals has considered a number of factors that are also present in this case:

> *  The contract was a contract of adhesion because it was presented on a take-it-or-leave-it basis. *The same is true in this case*.

\*   The agreement was eleven pages long.  *The alleged agreement in this case is 14 pages long.*

\* The ADR provisions were on p. 10 of the lengthy agreement. *The arbitration clause in this agreement was on p. 11 of a 14 page document.*

\* The A[DR] procedures were not "set forth in a separate stand-alone document."  *The same is true in this case.  Transcript at 65-66.  It is not a stand-alone document, but like the agreement in Howell, is "buried within the larger document."*

\*   The agreement did not contain an explanation of how mediation and arbitration worked. *Any such explanation is also absent from the arbitration clause in this case.  The claimed agreement in this case does not tell the customer how to initiate arbitration.  Transcript at 180-81.  In fact, as discussed below, it is affirmatively misleading.*

\*  The patients' husband was handed a form contract that he needed to sign very quickly.  *As discussed below, in this case Ms. Webb was told that her opportunity to purchase these bonds was a "one-day only opportunity."  She was pressured by Mr. Conaty to buy the bonds that same day (February 14, 2008). Because of her desire to protect the educational and health needs of her son she was under substantial pressure to complete the transaction on February 14, 2008.  Time was of the essence in Howell, because Mrs. Howell had to be placed in a nursing home expeditiously.  In this case Mr. Conaty created a false sense of urgency by deceiving Ms. Webb into thinking that the bonds were a "one-day-only" opportunity.*

\*  The A[DR] procedures did not contain any type of "short explanation" encouraging the patient/consumer to ask questions. *The same is true of the agreement in this case.*

\* The provision regarding the waiver of a jury trial "is buried -- and in no way highlighted."  *The same is true in this case.  In addition, the arbitration clause implies that there might be a right to trial by jury in the arbitration forum (FINRA) when it*

-12-

*states that the parties waive the right to a trial by jury "except as provided by the rules of the arbitration forum in which a claim is filed." In FINRA arbitrations, however, there is no right to a jury. Transcript at 159.*

\* The ADR procedures seem to imply that the defendant alone is responsible for choosing the arbitrator. *The same is true in this case. The arbitration clause appears to contemplate only FTBR making a written demand for arbitration, and the customer then designating the appropriate arbitration forum. There is no reference in the arbitration clause to the customer making a demand for arbitration.*

\* The waiver of a jury trial was "printed in the same font size, type and color as the rest of the agreement." *The same is true in this case. The reference to waiving the right to a jury trial except as provided by the rules of the arbitration forum is in the same small font size, type and color, as the preceding three pages, and most of the remainder of the agreement. Although certain language is in larger font size and bold-face font, the language about the jury waiver is not.*

*See also Howell*, supra, where the Court held:

The foregoing authorities support the Trial Court's determination that the arbitration clause should not be enforced under the circumstances. The Agreement is eleven pages long, and the arbitration provision is on page ten. Rather than being a stand-alone document, it is 'buried' within the larger document. It is written in the same size font as the rest of the agreement, and the arbitration paragraph does not adequately explain how the arbitration procedure would work, except as who would administer it.

Contrast *Buraczynski v. Eyring*, 919 S.W.2d 314 (Tenn. 1996) where the Supreme Court held:

[t]he patient is clearly informed by a provision in 10-point capital red type directly above the signature line, that 'by signing this contract you are giving up your right to a jury or court trial'

on any medical malpractice claim.

7. As noted above, the Tennessee Appellate Courts have considered as a factor whether an arbitration agreement adequately informs the consumer about how to commence arbitration. *See Howell v. NHC Healthcare - Fort Sanders, Inc.*, 109 S.W.3d 731, 734 (Tenn. Ct. App. 2003); *Raiteri v. NHC Healthcare/Knoxville, Inc.*, 2003 Tenn. App. LEXIS 957 (Tenn. Ct. App. Dec. 30, 2003). The alleged arbitration agreement in this case contains no such instruction or explanation. Moreover, the agreement is affirmatively misleading. The directions in FTBR's standard form to call one of two telephone numbers [are] also misleading. On p. 6, it states:

TO FILE A COMPLAINT, CONTACT
FIRST TENNESSEE BROKERAGE, INC., 530 OAK COURT DRIVE, SUITE 200, MEMPHIS, TN 38117, 800-238-1111 OR 901-818-6000

Coupled with the language in the arbitration clause on p. 11, this language would lead a reasonable customer to think that to file a complaint to initiate arbitration the customer should follow those directions. That is, however, misleading.

8. As noted above, the reference to the waiver of a right to a jury trial is misleading. In *Hill*, supra, the Court of Appeals examined a nursing home's admissions contract which included an arbitration clause and waiver of jury trial. The Court of Appeals noted that it was not clear that the "text indicating the patient's surrender of her right to a jury trial was sufficiently distinct from the rest of the contract to alert her to the fact that she was giving up such an important right." The same is true here.

9. FTBR's chief of compliance, Mr. Mann, testified that if you call that number, FTBR would not initiate arbitration. Ms. Webb indicated that she did call the 1-800 number, but received no help. They first referred her to Mr. Conaty. When she told them that the complaint concerned Mr. Conaty, they referred her to his supervisor. She told them that the complaint also concerned his supervisor. They did not refer her to Mr. Mann or offer any other help.

10. The Court also must consider the oppressive nature of the fees that the Claimant would have to pay in order to engage in arbitration in this case. As the Court of Appeals held in *Hill v. NHC Healthcare/Nashville, LLC*, 2008 Tenn. App. LEXIS 265 (Tenn. Ct. App. April 30, 2008):

> Thus, we conclude that an agreement to arbitrate that . . . places excessive cost on the claimant as a precondition to arbitration may be unconscionable because of the inequality of the bargain, the oppressiveness of the terms, or the one-sided advantage to the drafter. Consequently, the cost to initiate or pursue arbitration of the wrongful death claim in the case before us is a factor to be considered in determining whether the agreement to arbitrate is enforceable.

The Court declined to consider whether such costs could be shifted to the losing party, on the grounds that the mere payment of the up-front costs, regardless of any later cost-shifting, could be a deterrent to filing an arbitration claim.

11. The cost of arbitration was also considered by the Court in *Cooper v. MRM Investment Co.*, 199 F.Supp. 2d 771 (M.D. Tenn. 2002). Like the court in *Hill*, the Court also placed great weight upon the large fees that the plaintiff would have to pay for arbitration under the rules of the AAA. The Court noted that the "AAA rules impose a number of fees and costs that Plaintiff would have to bear as the 'initiating party.' Requiring a party to pay fees and costs, over and above what that party would have to pay in a court, may deprive that party of the right to vindicate his or her rights." The Court also noted that the plaintiff would have had to pay at least a part of the arbitrator's fees, as well as "various other fees that surpass the modest filing fees charge by the Federal Courts." The same is true in this case. Based upon reasonable assumptions of a 3-day hearing, an initial and final status conference, and two contested motions, the arbitration fees would exceed $13,000. Transcript at 187-92.

12. These significant fees do appear to be a deterrent to filing claims. Mr. Mann testified that FTBR had only been involved in two or three customer arbitrations during the 25-year period of its existence. It is inconceivable to the Court that a company in the securities business such as FTBR would only have two or three disputes over the course of its 25 year existence. Although it is impossible to know how many customers had complaints against FTBR over a 25-year period, and how many might have asserted lawsuits if they thought that option were available to them, the Court can reasonably infer from these statistics that customers are discouraged from filing arbitration claims because of the high out-of-pocket cost of filing and pursuing such claims. In this case, the filing fee alone would have been $1,575.00. Transcript at 188. As noted above, even under a relatively conservative estimate, the arbitration

-15-

fees would exceed $13,000.  Transcript at 184-91.

**Fraud in the inducement**.

13.  Claims of fraud in the inducement are not arbitrable.  *Frizzell Construction Co., Inc. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79 (Tenn. 1999); *City of Blaine v. John Coleman Hayes & Associates, Inc.*, 818 S.W.2d 33, 37 (Tenn. Ct. App. 1991).

14.  The Court finds that Ms. Webb was fraudulently induced to enter into the agreement with FTBR, which it contends includes the arbitration clause.

15.  Conaty fraudulently induced Ms. Webb into signing the contract based upon the representation that the opportunity to purchase a Lehman Brothers bond was a "one-day only opportunity," and that she needed to make a quick decision.  Transcript at 58, 64, 203.  This was not true.  This was a new issue of Lehman Brother[s] bonds, and the Initial Offering Period ("IOP") expired on February 14.  It is undisputed, however, that after that date the same bonds could be purchased on the secondary market, although the price might vary.  Transcript at 58-60 (Conaty testimony); 153 (Mann testimony); 289-90 (Harr testimony).  Mr. Conaty admits that he did not tell Ms. Webb that she could buy the same bonds on the secondary market after February 14, 2008.  *Id.* at 60.  Conaty's representation that the bonds were a "one-day only opportunity" was a false representation of material fact that fraudulently induced Ms. Webb into entering into the agreement.  In addition, his failure to disclose that the same bonds could be purchased on the secondary market after [the] IOP was a material omission that also fraudulently induced her to enter into the agreement.

16.  Mr. Conaty attempted to justify his statement about the "one-day only opportunity" by claiming that the expiration of the IOP was a material fact that he was obligated to disclose.  In the Court's view, that is highly questionable.  It amounts to a claim that the price of the bonds could be different the next day.  It is well known that the price of bond or any security can fluctuate daily, or even hourly.  The Court therefore has substantial questions about whether the fact that the IOP would expire and that the price for the bonds would fluctuate thereafter was a material fact that a sales representative was obligated to disclose.  Nevertheless, even if that were true, Mr. Conaty's disclosure was incomplete and misleading.  If it was material that February 14 was the last day of the IOP when the bonds could be bought at par, then it was equally material

to disclose that the bonds could still be purchased after the close of the IOP at a price that might be higher, might be lower, or might even be the same as the price during the IOP. Mr. Conaty's failure to disclose this created a false sense of urgency that was fraudulent and induced Ms. Webb into signing the agreement at issue.

17. Mr. Conaty's explanation that he presented the bonds as a "one-day only" opportunity because the opportunity to buy them at par expired on February 14 also appears to have been contrived after the fact. At his deposition Mr. Conaty was specifically asked, "What was the advantage to her purchasing from the issuer as opposed to the secondary market?" Mr. Conaty's answer was, "The advantage to her is that she could buy them that day from me." He did not mention that the advantage that she could purchase them that day at par value. *See* Transcript at 64.

18. Conaty also fraudulently induced Ms. Webb to enter into the agreement that FTBR contends contained the arbitration clause by representing that the bonds were a suitable investment for her and her son's needs. Contrary to his representations, the bonds were not a suitable investment, and his representations that they were suitable were fraudulent and induced Ms. Webb into making this investment under the false time pressure created by Mr. Conaty.

19. Both Ms. Webb and her husband, Mr. Everhart, testified extensively that both of them repeatedly advised Mr. Conaty about their son's special educational and medical needs. Transcript at 208, 227 and 253 (Webb testimony); 304 and 307 (Everhart testimony). Mr. Conaty denied knowing this. His denial, however, is not credible in view of Ms. Webb and Mr. Everhart's extensive testimony to the contrary.

20. Because of her son's special needs, Ms. Webb repeatedly advised Mr. Conaty that this investment had to be completely safe. Here the Court notes that there is a contradiction between Ms. Webb's desire for a higher rate of return and a completely safe investment. Based upon her testimony, however, it is obvious that she did not understand the relationship between risk and reward. *See* Transcript at 273-74. She obviously was not an experienced or sophisticated investor and Mr. Conaty did not explain to her that her stated investment objectives were not realistic. He admits that he never discussed anything about the risk of these bonds with her. Transcript at 261-62. The bonds at issue were rated "A," which is the third tier of investment grade

bonds.[10]  In view of Ms. Webb's stated investment objectives that the bonds had to be completely safe in order to provide for her son's special education and health needs, an investment in a single A rated bond was inappropriate and unsuitable.

21.   In addition, the 100% investment in a single series of bonds was an unsuitable investment because of the concentration and lack of diversification. It is akin to "putting all of your eggs in one basket."  This violates a fundamental principle of investing.  Transcript at 290-91.  Even Mr. Conaty admitted that putting 100% of a client's investment in bonds was not suitable if the client's investment objective was capital appreciation.  In Ms. Webb's account application the indicated investment objective was capital appreciation.  Transcript at 49.[11]

**Ms. Webb did not agree to arbitration.**

22.   The burden is on the Defendants to show that Ms. Webb agreed to arbitrate this dispute.  They have not done so.

23.  The Defendants did not introduce an arbitration agreement signed by Ms. Webb.  She testified that she never saw an arbitration agreement, and that Mr. Conaty did not discuss it with her.  Transcript at 265-66.  Mr. Conaty downloaded the account application form from a computer.  The pages were loose, not stapled together.  *Id.* at 265.  Mr. Conaty testified that his normal practice is to keep a copy of the pages that are the "brokerage copy" and that the customer takes the "customer copy" pages.  Transcript at 22.  Somewhat inconsistent with that, he testified that in this case he gave the complete agreement to Ms. Webb for her to take home to obtain her husband's signature. Ms. Webb testified that the arbitration agreement was not part of the package that she reviewed and that she never saw it and never discussed it with Mr. Conaty.  Transcript at 265-66.

24.   The next day (February 15, 2008), Ms. Webb went to First Tennessee Bank and gave it the documents that she had been given by Mr. Conaty to take home with her.  The Bank faxed [s]ome of these documents to Mr. Conaty's

---

[10]The Moody's rating for investment grade bonds are AAA, AA, A and BBB.  The bonds rated below BBB are considered "junk bonds."  Transcript at 286-87.

[11]Ms. Webb testified that Mr. Conaty completed this portion of the application.

assistant, Diana Gonzales. No one, however, was able to testify what documents were faxed to FTBR to enable it to open the account. Transcript at 106, 108-10 and 128. However, it is undisputed that the fax, which consisted of either 3 or 4 pages, did not include all of the pages that were necessary to properly open the account. Transcript at 127-28. The account therefore had not been properly opened when the bonds were purchased. Stacy Anderson Madar, a bank employee, testified that she put certain documents in the interoffice mail and sent them to Mr. Conaty at FTBR. She does not know, however, what pages she included in the interoffice mail. *Id.* at 113.

25. Ms. Webb testified unequivocally that she had never seen and did not have an arbitration agreement. FTBR has been unable to produce an arbitration agreement that she signed, or that was even a part of the package of documents that she signed. It therefore has not carried its burden of proof to show that there was a binding arbitration agreement.

**FTBR's forms are not a binding, enforceable agreement to arbitrate.**

26. Strangely, FTBR's form agreement does not contain any language where the customer expressly agrees to arbitrate. The arbitration clause, which appears on p. 11, does not contain a place for the customer to sign. Neither on that page nor elsewhere in FTBR's form, does the customer expressly say that she agrees to arbitrate. This omission contrasts with agreements used by other brokerage firms. *See, e.g.*, Tabs 4, 5, and 6 to Exhibit 15. The closest that FTBR's form agreement comes to language expressly agreeing to be bound is on p. 7 (customer copy) which states: "I REPRESENT THAT I HAVE READ THE *TERMS AND CONDITIONS* GOVERNING THIS ACCOUNT AND AGREE TO BE BOUND BY SUCH *TERMS AND CONDITIONS* AS CURRENTLY IN EFFECT AND AS MAY BE AMENDED FROM TIME TO TIME." (emphasis added). It is undisputed, however, that "terms and conditions" refers to pp. 8-10 and the top portion of p. 11, and does not include the "Brokerage Account Pre-dispute Arbitration Agreement" discussed below. Transcript at 67-68. Notably, that portion of p. 11 indicates that the customer must sign an arbitration agreement. Ms. Webb, however, has not done so.

27. The only other language in which the customer expressly agrees to anything in FTBR's form is on p. 6 where the customer acknowledges "that I have read, understood and agreed to the terms set forth in the **Customer Agreement** herein . . . ." (emphasis added). The remainder of the form makes clear that the "Customer Agreement" which begins on p. 8 is different from the

"Pre-dispute Arbitration Agreement" which is on p. 11.

28.   Page 6 also states "THIS ACCOUNT IS GOVERNED BY A PRE-DISPUTE ARBITRATION AGREEMENT, WHICH APPEARS ON PAGE 10 (Customer Copy)."  Page 10, of course, does not include the Pre-dispute Arbitration Agreement.  The reference to page 10 obviously is an error.  More importantly, however, this sentence lacks the language of the preceding sentence where the customer expressly "agree[s] to be bound."  The Court believes that when a party is foregoing a right as fundamental as a right to a trial by jury, there should be an express agreement to waive that right, which is absent here. *See Cooper v. MRM Investment Co.*, 199 F.Supp. 2d 771 (M.D. Tenn. 2002) (holding that the waiver of the right to a jury trial "must be both knowing and clear.  If the employee is not clearly made aware of [his/her] rights [he/]she is waiving, that waiver is not only invalid, but the entire agreement is rendered unduly oppressive.").

29.   Finally, p. 6 includes the following language:  "I ACKNOWLEDGE RECEIPT OF THE BROKERAGE ACCOUNT CUSTOMER AGREEMENT ON PAGE 8, PRE-DISPUTE ARBITRATION AGREEMENT ON PAGE 11 . . . ."  This acknowledgment of receipt falls short of an express agreement to arbitrate.

**The claims by the minor Plaintiff are not arbitrable under any circumstances.**

30.   It is well established that in Tennessee, that arbitration clauses are not binding on third parties who are not parties to the contract. *Cocke County Bd. of Highway Comm'rs v. Newport Utilities Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985) ("However, arbitration clauses are not binding on third parties who are not parties to the contract."); *Jackson v. Chambers*, 510 S.W.2d 74 (Tenn. 1974) ("The defendant . . . was not a party to the lease contract and was not bound by the agreement to arbitrate.").  The minor plaintiff, D.P., was not a party to any arbitration agreement, and it would not be binding even if he were.

31.   The minor Plaintiff is a third-party beneficiary of the agreement to purchase the Lehman Brothers bonds to provide for his medical and educational needs. He is entitled to assert claims and, as a minor, is not bound by the arbitration clause.  Even an adult third-party beneficiary is not bound by an arbitration clause when he sues on legal theories not seeking to enforce the terms of the contract. *See Benton v. Vanderbilt University*, 137 S.W.3d 614,

-20-

620 (Tenn. 2004).

(Emphasis in original.).  From the trial court's order, the defendants filed this timely appeal.

## II.  ISSUE

The defendants assert the issue on this appeal is whether the trial court erred in denying the motion to compel arbitration.  The defendants make several arguments.

## III.  STANDARD OF REVIEW

When ruling on the appeal of a denial of a motion to compel arbitration, we must follow the standard of review that applies to bench trials. *Spann v. American Express Travel Related Servs. Co.*, 224 S.W.3d 698, 706-07 (Tenn. Ct. App. 2006).  Under that standard, review of the trial court's findings of fact are "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d).  Questions of law are reviewed de novo without a presumption of correctness.  *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001).

We afford great deference to the trial court's assessment of the credibility of the witnesses, and we will not reassess factual findings on witness credibility unless clear and convincing evidence supports a different finding.  *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn. Ct. App. 2009).

## IV.  DISCUSSION

The defendants initially note that in this action the trial court adopted verbatim the proposed 16-page order drafted by the plaintiffs' counsel.  They assert the order was drafted by counsel prior to the ruling after the evidentiary hearing.  The defendants argue the trial court's order contains numerous errors.

The issue of party-prepared orders has been addressed recently by this court.  *See Smith v. UHS of Lakeside, Inc*, No. W2011-02405-COA-R3-CV, 2013 WL 210250, at *8-11 (Tenn. Ct. App. Jan. 18, 2013); *Beach Cmty. Bank v. Labry*, No. W2011-01583-COA-R3-CV, 2012 WL 2196174, at *5 (Tenn. Ct. App. June 15, 2012).  In *Labry*, we observed that

after the adoption of the Tennessee Rules of Civil Procedure, the Supreme Court, in *Delevan-Delta Corp. v. Roberts*, 611 S.W.2d 51 (Tenn. 1981), recognized that "the thorough preparation of suggested findings and conclusions by able counsel can be of great assistance to the trial court." *Id.* at 52-53. Accordingly, the Supreme Court held that "although it is improper for the trial court to require counsel to prepare findings, it is permissible and indeed sometimes desirable for the trial court to permit counsel for any party to submit proposed findings and conclusions." *Id.* at 53.

The decision in *Roberts* was discussed in detail by this Court in *Madden Phillips Const., Inc. v. GGAT Development Corp.*, 315 S.W.3d 800 (Tenn. Ct. App. 2009). According to this Court:

> The *Roberts* court offered guidance to lower courts when establishing findings of fact. The court maintained a clear preference for factual findings that are a product of the judge's own labor. *Id.* The *Roberts* court recognized, however, that other procedures sufficiently maintain the independence and impartiality of courts that adopt party-prepared findings. The court stated that trial judges may rely on party-prepared findings, so long as they carefully review proposed findings to ensure that the findings reliably reflect the court's opinion based on the testimony and evidence produced at trial. *Id.* The court also recognized a need to ensure that the proposed findings dispose of all relevant issues. *Id.* The court advised trial courts to "ascertain that [party-prepared findings] adequately dispose of all material issues, and to assure that matters not a proper part of the determination have not been included." *Id.*

*Id.* at 810-11.

*Labry*, 2012 WL 2196174, at *5. Accordingly, party-prepared orders are allowable under the following circumstances: (1) the trial court does not require counsel to prepare the orders; (2) the trial court carefully reviews the orders to ensure that the conclusions reliably reflect the court's opinion; (3) the orders dispose of all relevant issues; and (4) no matters not a proper part of the determination are included. *Id.* (citing *Madden Phillips*, 315 S.W.3d at 811). *See also Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 253 (Tenn. Ct. App. 1990) (noting that the chancellor's opinion reproduced verbatim the proposed findings of defendant).

We find nothing in the record indicates that the order entered does not reflect the trial court's view of the case. There is no indication that the trial court did not review the findings to ensure that they disposed of all the issues before it. Accordingly, we hold that the trial court's decision to adopt the proposed order of the plaintiffs was not reversible error. The findings are entitled to the ordinary presumption of correctness.

## A.
## ARBITRATION AGREEMENT

The defendants contend that the trial court erred when it failed to enforce the arbitration provision in the agreement. They argue that "[b]ecause the sale of bonds involves interstate commerce, the FAA [Federal Arbitration Act] governs the contract in this case." *See Morgan Keegan & Co. v. Smythe*, No. W2010-01339-COA-R3-CV, 2011 WL 5517036, at *6 (Tenn. Ct. App. Nov. 14, 2011) ("Numerous courts have concluded that securities transactions clearly involve interstate commerce and that, therefore, the arbitration agreements connected with such transactions are subject to enforcement under the FAA."). The defendants further assert that the arbitration agreement is a separate document from the provisions of the Customer Agreement governed by the Tennessee choice-of-law provisions and that the arbitration agreement provides it is governed by the Federal Arbitration Act.

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 2, et seq., "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592, 595 (6th Cir. 1995) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 937 (1983)). It mandates that arbitration clauses in commercial contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA applies to all state and federal cases in which the contract at issue requiring arbitration involves or affects interstate commerce. *Southland Corp. v. Keating*, 465 U.S. 1, 10, 104 S.Ct. 852 (1984); *Frizzell Constr. Co. v. Gatlinburg, LLC*, 9 S.W.3d 79, 83-84 (Tenn. 1999) (discussing the interstate commerce requirement). Accordingly, the defendants argue that the FAA is the controlling law in this case and that under it, the trial court did not have jurisdiction to determine the validity of the agreement.

In a contest involving an arbitration agreement, a court has to decide "certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452, 123 S.Ct. 2402 (2003) (citations omitted). "Generally, whether a valid agreement to arbitrate exists between the parties is to be

-23-

determined by the courts, and if a complaint specifically challenges the arbitration clause on grounds such as fraud or unconscionability, the court is permitted to determine it[s] validity before submitting the remainder of the dispute to arbitration." *Taylor v. Butler*, 142 S.W.3d 277, 283-84 (Tenn. 2004) (citations omitted).

Both federal and state law allow courts to apply applicable state law defenses to contract enforcement of arbitration provisions and to decline to enforce such a provision "upon such grounds as exist at law or in equity for the revocation of any contract." Tenn. Code Ann. § 29-5-302; *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652 (1996) (holding that generally applicable contract defenses may be applied to invalidate arbitration agreements without contravening the FAA). Applicable grounds for refusing enforcement may include the defenses of laches, estoppel, waiver, fraud, duress, and unconscionability. *Spann*, 224 S.W.3d at 711.

The documents at issue in this matter stipulated that "[t]his Agreement and its enforcement shall be governed by the laws of the State of Tennessee[.] . . ." "Tennessee law contemplates judicial resolution of contract formation issues." *Frizzell Constr. Co.*, 9 S.W.3d at 85. Accordingly, the trial court properly concluded that it had jurisdiction to address the issues regarding whether the agreement (including the arbitration agreement) was unenforceable.

Similarly, the trial court had jurisdiction to determine the contract formation issue of whether Ms. Webb was fraudulently induced to enter into the agreement with FTBR. When the parties have agreed that Tennessee law governs the agreement, an agreement to arbitrate procured by fraudulent inducement is not enforceable. *Id.* Accordingly, in this case, the agreement would allow for arbitration of "all controversies that may arise between" the parties "but only to the extent allowed by Tennessee law." Because Tennessee law "contemplates judicial resolution of contract formation issues," the inclusion of the Tennessee choice-of-law provision requires us to find that the parties "indicated their intention not to submit such issues to arbitration." *Id.* Thus, the issue of fraudulent inducement was not required to be arbitrated. *Id.*

The defendants direct us to a federal district court case, *SL Tennessee, LLC v. Ochiai Georgia, LLC*, No. 3:11-CV-340, 2012 WL 381338 (E.D. Tenn. Feb. 6, 2012), in which that district court found that fraudulent inducement must be arbitrated under the rules of the FAA, even in the face of *Frizzell* and a Tennessee choice-of-law provision. *Ochiai*, 2011 WL 381338, at *4. The court observed that "although the Contract in this case contains a choice-of-law provision providing that the contract is to be governed and interpreted under Tennessee law, there is no clear and unequivocal indication that Tennessee law should displace the federal standard on arbitration." *Id.* at *6. We are obligated to follow *Frizzell*,

not *Ochiai*.

In support of our conclusion, we note that in *River Links at Deer Creek, LLC v. Melz*, 108 S.W.3d 855 (Tenn. Ct. App. 2002), we previously observed that fraudulent inducement claims are not subject to arbitration:

> Further, our courts have declared that claims of fraud in the inducement are not subject to arbitration. This court held that when a contract has been procured through fraud then "unless a defrauded party elects to affirm it, there is absolutely no contract, nothing to be arbitrated." Our Supreme Court more broadly stated that "Tennessee law does not allow arbitration of contract formation issues."

108 S.W.3d at 859 (citations omitted). We reached a similar result in *Howell v. NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731 (Tenn. Ct. App. 2003). In *Howell*, the defendant contended that the FAA controlled because the contract involved interstate commerce, and that the enforceability of the arbitration clause therefore had to be determined by the arbitrators, not the court. We concluded:

> [W]hile courts are required to give an arbitration agreement "as broad a construction as the words and intentions of the parties will allow," this applies to the scope of the agreement, and not whether grounds exist to deny enforceability of the agreement.

109 S.W.3d at 733 (citations omitted).

We find that pursuant to controlling authority from both the United States Supreme Court and the Tennessee Supreme Court, the interpretation of the customer agreement, including the enforceability of the arbitration clause, is governed by state law. Further, under Tennessee law, claims of fraudulent inducement are not arbitrable but are for judicial determination. The trial court correctly retained jurisdiction of this dispute.

### B.
### UNCONSCIONABLE CONTRACT OF ADHESION

The trial court found that the agreement in this case was an unconscionable contract of adhesion. The relevant definition of an adhesion contract was set out in *Buraczynski v. Eyring*, 919 S.W.2d 314 (Tenn. 1996):

An adhesion contract has been defined as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." Professor Henderson has observed that "the essence of an adhesion contract is that the bargaining position and leverage enable one party to select and control risks assumed under the contract." Courts generally agree that "[t]he distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms."

*Buraczynski*, 919 S.W.2d at 320 (citations omitted). FTBR's agreement is a standard form document. No negotiation is permitted. It is essentially presented on a take-it-or-leave-it basis. Mr. Conaty admitted that if someone wanted to do business with FTBR, the form agreement had to be used.

If a contract is one of adhesion, the next question is whether it contains such unconscionable or oppressive terms as to render it unenforceable. *Buraczynski*, 919 S.W.2d at 320. The Tennessee Supreme Court has held that a contract is not enforceable if its terms are "beyond the reasonable expectations of an ordinary person," or it is "oppressive," or it is "unconscionable." *Buraczynski*, 919 S.W.2d at 320. In determining whether a contract is unconscionable, the *Taylor* court held:

A determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and the existence of unfair terms in the contract.

*Taylor*, 142 S.W.3d at 285. "In determining whether a contract is unconscionable, a court must consider all the facts and circumstances of a particular case. If the provisions are then viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable." *Haun v. King*, 690 S.W.2d, 869, 872 (Tenn. Ct. App. 1984). As noted in *Hill v. NHC Healthcare/Nashville, LLC*, No. M2005-01818-COA-R3-CV, 2008 WL 1901198 (Tenn. Ct. App., Apr. 30, 2008), "the question of unconscionability requires courts to consider all the facts relating to a contract's purpose and effect as well as to the setting in which it was signed. One particular fact may not be the determinative factor; instead, it is the overall situation that must be considered." *Hill*, 2008 WL 1901198, at *17.

As observed by the trial court, a significant circumstance is that the agreement was

-26-

signed under compelling time constraints and that it did not afford the customer the right to revoke the arbitration provisions within a reasonable period of time. *See Buraczynski*, 919 S.W.2d at 320-21. Further, that one party is more sophisticated than the other must be taken into consideration. *See Taylor*, 142 S.W.3d at 285. Additionally, in this case, the arbitration clause was not contained in a separate document, but was contained on page 11 of a lengthy agreement. There was no explanation of binding arbitration, "nor any language that would encourage the customer to ask questions about the process." *See Hill*, 2008 WL 1901198, at *9. Also, the costs involved in arbitration was a proper consideration in assessing unconscionability. It was FTBR's burden "to show that the parties actually bargained over the arbitration provision or that it was a reasonable term considering the circumstances." *Brown v. Karemor Intl., Inc.*, (Tenn. Ct. App. 1999). The record shows that the trial court correctly found that FTBR did not carry its burden.

## C.
## BINDING AGREEMENT WITH MS. WEBB

The trial court concluded that the defendants had failed to carry their burden of proving that Ms. Webb entered into a valid and enforceable agreement to arbitrate this dispute. The defendants argue that this finding is "not supported by the evidence." They note that Ms. Webb, just above her signature, expressly represented that she "READ THE TERMS AND CONDITIONS GOVERNING THIS ACCOUNT," that she agreed "TO BE BOUND BY SUCH TERMS AND CONDITIONS AS CURRENTLY IN EFFECT," that the "ACCOUNT IS GOVERNED BY A PRE-DISPUTE ARBITRATION AGREEMENT," and that she "ACKNOWLEDGE[D] RECEIPT OF THE . . . PRE-DISPUTE ARBITRATION AGREEMENT."

The plaintiffs contend that the defendants did not introduce an arbitration agreement signed by Ms. Webb. They assert she never received an arbitration agreement. Ms. Webb testified that she never saw such an agreement when she was signing the documents and Mr. Conaty did not discuss an arbitration agreement with her.

Mr. Conaty testified that he gave Ms. Webb a package of documents to take home. According to Ms. Webb, when she returned to FTB the next day, she had not even opened the packet she took away from her meeting with Mr. Conaty the day before. She related that she gave the FTB employee all the papers she had received the previous day and did not keep any. The FTB employee subsequently faxed some of these documents to Mr. Conaty's office and put all documents that Ms. Webb had in the inter-office mail to send to FTBR. No one, however, can identify the documents that were faxed to FTBR to enable it to open the account, and FTBR has never been able to locate and identify the documents sent to it that

same day in the interoffice mail.  It therefore has no evidence to refute Ms. Webb's testimony that she gave everything back to FTB and that her package of documents did not include an arbitration agreement.  FTBR therefore has not carried its burden of proof to show that Ms. Webb agreed to arbitrate.

In view of our holdings that the trial court properly determined that the arbitration agreement is unenforceable in this matter, we pretermit consideration of the remaining arguments raised by the defendants.

## V.  CONCLUSION

We affirm the decision of the trial court only as to arbitration; we vacate any findings that go to the merits of the underlying case and remand for further proceedings.  The costs on appeal are assessed to the appellants, First Tennessee Brokerage, Inc. and Michael Conaty.


_____
JOHN W. McCLARTY, JUDGE